**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 29, 2011

S T A T E   O F   M I C H I G A N

SUPREME COURT

KEVIN KROHN,

       Plaintiff-Appellant,

v                                                        No. 140945

HOME-OWNERS INSURANCE
COMPANY,

       Defendant-Appellee.

BEFORE THE ENTIRE BENCH

ZAHRA, J.

Plaintiff, Kevin Krohn, who suffered an extremely severe spinal fracture that left

him paraplegic, brought this suit under the no-fault act, MCL 500.3101 *et seq*. Plaintiff

sought personal protection insurance benefits from defendant, Home-Owners Insurance

Company, to cover costs incurred for a surgical procedure performed in Portugal. It is

undisputed that this surgical procedure was experimental and not a generally accepted

treatment for plaintiff's injury. The dispositive question presented in this case is whether

this experimental procedure was a reasonably necessary service for plaintiff's care,

recovery, or rehabilitation under MCL 500.3107(1)(a). We conclude that if a medical treatment is experimental and not generally accepted within the medical community, an insured seeking reimbursement for this treatment must, at a minimum, present objective and verifiable medical evidence establishing that the treatment is efficacious. A treatment or procedure that has not been shown to be efficacious cannot be reasonable or necessary under the no-fault act. An insured's subjective belief that medical treatment is efficacious, reasonable, and necessary is not enough to create a question of fact. Viewed in the light most favorable to plaintiff, the objective and verifiable medical evidence presented at trial failed to establish that the experimental surgical procedure at issue was in any way efficacious in plaintiff's care, recovery, or rehabilitation. Plaintiff's expert witnesses merely opined that plaintiff's decision to undertake the experimental surgical procedure was an "understandable" personal decision that offered plaintiff only a medically unproven "possibility," or hope, for an efficacious result. Therefore, the procedure was not an allowable expense under MCL 500.3107(1)(a). We affirm the judgment of the Court of Appeals.[1]

## I. FACTS AND PROCEEDINGS

On December 11, 2001, plaintiff was struck head-on by a large van while riding his motorcycle. Plaintiff suffered a severe spinal fracture that left him paraplegic, without sensation or function below the mid-chest area ("injury site"). Consequently, plaintiff was unable to touch his feet, move any part of his lower body, or determine

---

[1] Although we affirm the judgment of the Court of Appeals, we do so for reasons different from those stated by the Court of Appeals.

2

when to relieve himself. Plaintiff underwent intensive physical therapy but did not regain any sensation below the injury site and was released from the program.

While investigating treatment options, plaintiff discovered a procedure known as olfactory ensheathing glial cell transplantation, an experimental surgery performed in Portugal. The procedure involves transplanting tissue from behind the patient's sinus cavities, which contains stem cells, to the injury site. The theory behind the procedure is that, once applied to the injury site, the transplanted stem cells could develop into spinal cord nerves. The procedure is not approved by the United States Food and Drug Administration (FDA) and therefore cannot be legally performed in the United States. In addition, there is insufficient existing research to allow for clinical trials, including controlled studies, peer review, and publication for FDA evaluation. Thus far, no one has applied for FDA approval of the procedure for any purpose.

In March 2005, plaintiff visited the Rehabilitation Institute of Michigan (RIM) and discussed the procedure with Dr. Steven Hinderer. Dr. Hinderer specializes in physical medicine and rehabilitation and is the medical director of the Center for Spinal Cord Injury Recovery Program (CSCIRP). Dr. Hinderer explained to plaintiff that he could not endorse or in any way recommend the procedure because it was highly experimental, had not yet been approved by the FDA, could not be legally performed anywhere in the United States, and lacked medical evidence to establish its efficacy.[2] Neither party

_____

[2] The dissent claims we erroneously conclude that Dr. Hinderer's testimony cast doubt on the efficacy of the procedure. Dr. Hinderer's testimony, however, merely suggested that the procedure required scientific research. The literature from the CSCIRP clearly outlined the highly experimental nature of this procedure. According to defendant's brief in this Court, the literature stated that "[t]here has been very little scientific data

3

disputes that no one had yet applied for FDA approval of the procedure for any purpose, and the existing research was insufficient to allow clinical trials to begin. Dr. Hinderer also informed plaintiff that the procedure was not part of standard clinical care and was not likely to be covered by insurance. After consulting with Dr. Hinderer, plaintiff met with a patient who had undergone the procedure. Plaintiff claimed that this individual was able to stand on a device similar to a treadmill and walk with braces after the procedure.[3]

After seeking advice from family members, plaintiff decided to undergo the procedure in Portugal. Plaintiff's primary health insurer denied coverage. Plaintiff then sought coverage from defendant, a no-fault auto insurance provider. Defendant's claims specialist told plaintiff that defendant would pay for testing to determine whether plaintiff medically qualified for the procedure, but would not pay for the procedure itself because it was experimental, non-FDA approved, and illegal to perform in the United States.

Plaintiff traveled to Portugal and underwent the procedure on November 10, 2005. Ten days later, plaintiff returned to the United States and began what he described as a grueling physical therapy program at the RIM, entailing four-hour therapy sessions three

collection of the efficacy and long-term outcome of these procedures." The literature also encouraged those "who choose to pursue these alternative surgical procedures" to enroll in the RIM's clinical research study to "begin scientific knowledge" and "evaluate the effectiveness of these procedures." This literature was provided to plaintiff before he decided to undergo the procedure, and Dr. Hinderer's trial testimony was consistent with the CSCIRP literature.

[3] The medical history of this individual was not developed at trial and there was no medical evidence in the record establishing that the procedure caused any improvement this individual may have experienced.

times a week. Defendant paid for all the postsurgical physical therapy treatment plaintiff received. Plaintiff filed suit against defendant to recover the expenses he incurred traveling to and from Portugal and undergoing the surgery. At trial, plaintiff testified that he noticed improvements immediately after the procedure. Specifically, plaintiff testified that he could sometimes move his legs, crawl forward and backward, and control bowel and bladder movements, resulting in fewer urinary tract infections.

Dr. Hinderer testified that plaintiff had experienced "some small amount of voluntary motor function" after the procedure. Dr. Hinderer also testified that it was not possible to conclude that these minor improvements were the result of the procedure. Dr. Hinderer acknowledged that the intense physical therapy program in which plaintiff engaged postprocedure could alone have accounted for plaintiff's improvements.[4] Dr. Hinderer testified about the highly experimental nature of the procedure. He described plaintiff's decision to undergo the procedure as a "personal choice" and acknowledged that this procedure was not considered necessary to the treatment and care of spinal cord injuries.

Dr. Carl Lima, a neurologist and neuropathologist at a public hospital in Portugal who is not licensed in the United States, was a member of plaintiff's surgical team, but did not perform the procedure. According to Dr. Lima, experimental data showed that transplanting nasal tissue, which contains stem cells, to the injury site provides functional

---

[4] Dr. Hinderer was asked whether he had seen patients make similar improvements after very aggressive physical therapy without this surgery. He responded that he sees "improvements in virtually all participants [who undergo intensive physical therapy], surgery or no surgery."

recovery of neurons. He testified that this research had begun 18 years earlier on guinea pigs. There was no evidence presented at trial that the procedure has been efficacious in guinea pigs. The testimony established only that the procedure could be performed on guinea pigs without the guinea pigs' developing infections or forming tumors.

Dr. Lima testified that he started conducting human trials of the procedure in the government-operated hospital where he works, which sanctions the procedure for research purposes. No testimony was offered to suggest that the hospital had sanctioned the procedure because of its efficaciousness. Dr. Lima testified that, since 2001, 110 patients have undergone the procedure; however, Dr. Lima did not offer testimony regarding individual patients, the severity or location of their injuries, the outcomes following their procedures, or their prognoses. Dr. Lima published a paper in 2006 that summarized the outcome for seven patients who had undergone the procedure. All seven patients engaged in physical therapy following the procedure, but only two of the seven showed improvements in bladder and bowel control. Although there had been no controlled clinical studies regarding this procedure, Dr. Lima testified, "I would say the majority of the patients have some kind of improvement."[5]

---

[5] The dissent cites Dr. Lima's testimony as providing that "of the 110 patients who had undergone the treatment in his program, a majority of the patients showed improvement." *Post* at 3. However, the lower court record only reflects that Dr. Lima testified as follows:

> *Q.* Overall, would you describe—how would you describe the degree of success of the surgeries on patients?

> *A.* Well, maybe I'm not right person to say that, and that's why we want to publish the whole results of the patient, but I would say the majority of patients have some kind of improvement.

6

Dr. Lima found plaintiff's spinal cord injury to be one of the most severe injuries that he had ever treated. Dr. Lima testified that he was very surprised by the "quite unexpected" results of plaintiff's procedure. Dr. Lima acknowledged that plaintiff would never fully recover from such a severe injury. Nonetheless, Dr. Lima testified that the procedure was necessary to allow plaintiff a chance at some recovery. He added that any degree of recovery requires physical therapy. Although Dr. Lima conceded that the procedure was experimental, he opined that it was reasonably necessary because a person with a chronic spinal cord injury has no other available option. The lack of FDA approval did not change Dr. Lima's opinion.

Defendant moved for a directed verdict, arguing that as a matter of law, experimental surgery is not "reasonably necessary" under the no-fault act. The trial court denied defendant's motion, ruling that whether the procedure was "reasonably necessary" was a question of fact. The jury rendered a verdict in favor of plaintiff, concluding that the procedure was reasonably necessary. Judgment was entered, awarding plaintiff $51,412.85 in allowable expenses, plus interest, case-evaluation sanctions, and taxable costs.

---

This testimony hardly demonstrates that a "majority of patients showed improvement." The testimony better reflects that Dr. Lima could only guess that the experimental surgical procedure was efficacious in some patients. More significantly, this testimony reflects Dr. Lima's assumption that any improvement that may have been noted was the result of the experimental surgical procedure and not physical therapy alone. As both Dr. Hinderer and Dr. Lima stated, and as plaintiff concedes, there is no evidence regarding the extent to which any improvement after this procedure can be attributed to the procedure alone, physical therapy alone, or a combination thereof. To this extent, the quoted testimony reflects an absence of the objectivity required to support a legal conclusion that the procedure is efficacious.

7

The Court of Appeals reversed. The Court of Appeals observed that because the dispositive issue required a review of medical judgment, plaintiff was required to present expert testimony.[6] Citing *SPECT Imaging, Inc v Allstate Ins Co*,[7] the Court of Appeals concluded that plaintiff was required to demonstrate that the procedure had gained general acceptance in the medical community.[8] Because plaintiff lacked such proof, the Court of Appeals concluded that a directed verdict in favor of defendant was required.[9] The dissent criticized the majority for sua sponte raising the issue of admissibility of scientific evidence because the issue was not preserved for appellate review.[10] The dissent also concluded that the question whether the procedure was "reasonably necessary" was properly submitted to the jury.[11]

Plaintiff applied for leave to appeal in this Court. We granted the application to consider, among other issues, whether the experimental surgical procedure plaintiff underwent in Portugal was an allowable expense under MCL 500.3107(1)(a) of the no-fault act.[12]

---

[6] *Krohn v Home-Owners Ins Co*, unpublished opinion of the Court of Appeals, issued January 26, 2010 (Docket No. 283862), p 3.

[7] *SPECT Imaging, Inc v Allstate Ins Co*, 246 Mich App 568, 578; 633 NW2d 461 (2001).

[8] *Id*. at 3-4.

[9] *Id*. at 5-6.

[10] *Id*. at 5 (FORT HOOD, P.J., dissenting).

[11] *Id*. at 8.

[12] *Krohn v Home-Owners Ins Co*, 488 Mich 876 (2011).

## II.  STANDARD OF REVIEW

We review de novo a trial court's decision to direct a verdict.[13]  In doing so, we "review the evidence and all legitimate inferences in the light most favorable to the nonmoving party."[14]  Only if the evidence, when viewed in this light, fails to establish a claim as a matter of law should a motion for a directed verdict be granted.[15]

Issues of statutory interpretation are questions of law that this Court reviews de novo.[16]

## III.  ANALYSIS

## A.  BACKGROUND

The Michigan no-fault act requires that owners and registrants of automobiles carry personal protection insurance to cover an insured's medical care arising from injuries sustained in an automobile accident.[17]  This case requires us to determine whether the experimental surgical procedure undergone by plaintiff constituted a

---

[13]*Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW 2d 186 (2003).

[14] *Id*. (quotation marks and citations omitted).

[15] *Id*.

[16] *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 525-526; 697 NW2d 895 (2005).

[17] MCL 500.3101(1); MCL 500.3105(1).  We note that while the no-fault act mandates the minimum insurance coverage to be obtained by an owner or registrant of an automobile, it does not bar an insured from obtaining insurance coverage in excess of that amount.  As a preliminary matter, we note that all owners and registrants of automobiles in Michigan are free to purchase insurance contracts that provide greater coverage than the minimum required under the no-fault act.

compensable expense under the personal protection insurance requirements of MCL

500.3107(1)(a). MCL 500.3107(1) provides in pertinent part:

> [P]ersonal protection insurance benefits are payable for the following:
>
> (a) Allowable expenses consisting of all reasonable charges incurred for *reasonably necessary* products, services and accommodations *for an injured person's care, recovery, or rehabilitation*. [Emphasis added.]

## B. PRINCIPLES OF STATUTORY INTERPRETATION

The primary goal of statutory interpretation is to "ascertain the legislative intent that may reasonably be inferred from the statutory language."[18] "The first step in that determination is to review the language of the statute itself."[19] Unless statutorily defined, every word or phrase of a statute should be accorded its plain and ordinary meaning,[20] taking into account the context in which the words are used.[21] We may consult dictionary definitions to give words their common and ordinary meaning.[22] When given their

---

[18] *Griffith*, 472 Mich at 526, citing *Sotelo v Grant Twp*, 470 Mich 95, 100; 680 NW2d 381 (2004).

[19] *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999), citing *House Speaker v State Admin Bd*, 441 Mich 547, 567; 495 NW2d 539 (1993).

[20] MCL 8.3a; *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002).

[21] *2000 Baum Family Trust v Babel*, 488 Mich 136, 175; 793 NW2d 633 (2010).

[22] *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004).

10

common and ordinary meaning,[23] "[t]he words of a statute provide 'the most reliable evidence of its intent . . . .'"[24]

## C. PRECEDENT

This is not the first time this Court has been called upon to interpret MCL 500.3107(1)(a). In *Nasser v Auto Club Ins Ass'n*,[25] this Court held that under MCL 500.3107(1)(a), "an insurer is not *liable* for any medical expense . . . if the product or service itself is not reasonably necessary."[26] This Court further observed that "[t]he plain and unambiguous language of [MCL 500.3107] makes both reasonableness and necessity explicit and necessary elements of a claimant's recovery, and thus renders their absence a defense to the insurer's liability."[27] This Court rejected the notion that public-policy concerns would require the payment of expenses for medical care not shown to be reasonable and necessary to the care of an insured. Justice BOYLE, writing for the majority, observed that "[w]hile policy considerations may indeed cause some reluctance on the part of courts to allow insureds to be 'stuck' with unnecessary expenses" that they incurred, "that determination was made by the Legislature when it drafted [MCL 500.3107] and restricted [personal protection insurance] benefits under a rule of

---

[23] *Veenstra v Washtenaw Country Club,* 466 Mich 155, 160; 645 NW2d 643 (2002), citing MCL 8.3a.

[24] *Klooster v City of Charlevoix*, 488 Mich 289, 296; 795 NW2d 578 (2011), quoting *United States v Turkette*, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981).

[25] *Nasser v Auto Club Ins Ass'n*, 435 Mich 33; 457 NW2d 637 (1990).

[26] *Id*. at 49 (emphasis in original).

[27] *Id*.

reasonableness."[28]  Finally, this Court recognized that while the question of reasonable necessity under this provision is generally one for a jury, "it may in some cases be possible for the court to decide the question of the reasonableness or necessity of particular expenses as a matter of law . . . ."[29]

While *Nasser* made clear that the language of MCL 500.3107 only permits an insured to recover expenses that are reasonable and necessary to the care, recovery, or rehabilitation of the insured, *Nasser* provided little guidance on how properly to determine what is a reasonably necessary expense or when such a determination may be made as a matter of law.  To provide guidance along these lines, we observe that the no-fault act does not require coverage for *all* treatments.  Obviously, treatments such as apricot pit therapy, coning (ear candling), homeopathy, magnet therapy and psychic surgery are patently unreasonable.  Even if administered by licensed health-care providers, these so-called treatments not only lack a scientific basis to conclude that they are generally accepted by the medical community, but there is simply no basis to conclude that they are at all efficacious.  On the other hand, we presume, subject to rebuttal, that services generally accepted by the medical community for treatment or care of a specific and diagnosed injury are reasonably necessary under MCL 500.3107(1)(a).  Less clear is the case presented here, in which an insured has undergone a surgical procedure that is not generally accepted by the medical community.  Defendant maintains that experimental procedures, by their nature, cannot, as a matter of law, be reasonably

---

[28] *Id*. at 55.

[29] *Id*.

necessary under the no-fault act. We reject defendant's position and conclude that experimental treatments are not necessarily barred from being compensable under the no-fault act. The ultimate question whether the surgical procedure at issue here is a covered expense under the no-fault act does not turn on its status as experimental. Rather, like all claims for allowable expenses, the question turns on whether the procedure was reasonably necessary for plaintiff's care, recovery, or rehabilitation.

D. MCL 500.3107(1)(a) MUST BE ASSESSED USING AN OBJECTIVE STANDARD

In order to give meaning to this statutory provision, we start by examining the perspective from which reasonable necessity is determined. Stated more precisely, when the Legislature provided that allowable expenses consist of "all reasonable charges incurred for *reasonably necessary* products, services and accommodations for an injured person's care, recovery, or rehabilitation," did it intend for reasonable necessity to be determined under a subjective or objective standard?

The term "reasonable" commonly refers to that which is "agreeable to or in accord with reason; logical," or "not exceeding the limit prescribed by reason; not excessive[.]"[30] The term "reasonable" has also been defined to mean "fair, proper, or moderate under the circumstances"[31] and "[f]it and appropriate to the end in view."[32] These definitions evidence an absence of the personal sentiment, prejudice, and bias associated with a subjective point of view, which is "based on an individual's perceptions, feelings, or

---

[30] *Random House Webster's College Dictionary* (2000).

[31] Black's Law Dictionary (7th ed).

[32] Black's Law Dictionary (6th ed).

intentions," rather than the "externally verifiable phenomena" associated with an objective viewpoint.[33] Accordingly, we conclude that reasonableness is not based merely on the subjective perception that a service is necessary for an injured person's care, recovery, or rehabilitation. Rather, the term "reasonably" must be determined under an objective perspective.

This conclusion is entirely consistent with this Court's precedent interpreting MCL 500.3107. In *Nasser*, the plaintiff was involved in a minor accident. Complaining of pain in his "head, neck, chest, shoulder, and both upper and lower back, as well as blurred vision and nausea, he initially sought medical treatment from an internist, who then admitted him to a hospital.[34] Over the following three months, he spent 50 days in the hospital and underwent a battery of medical tests.[35]

The plaintiff's no-fault insurer refused to pay for the plaintiff's hospitalization, and the plaintiff sued to recover allowable expenses under the no-fault act.[36] The trial court granted the plaintiff summary disposition on the issue of liability.[37] The Court of Appeals affirmed, citing policy considerations to justify allowing the plaintiff to rely on his subjective beliefs that his hospital expenses were "reasonably necessary" when he

---

[33] Black's Law Dictionary (7th ed) (defining "subjective").

[34] *Nasser*, 435 Mich at 38.

[35] *Id*.

[36] *Id*. at 38-39.

[37] *Id*. at 40-41.

accepted treatment.[38] In doing so, the Courts of Appeals also agreed with the plaintiff that "[t]he reasonableness of medical expenses cannot be used as a defense to liability in a no-fault accident case."[39] This Court rejected both the plaintiff's claims, clearly stating that the defendant insurer could challenge the reasonableness of the plaintiff's expenses and impliedly rejecting the plaintiff's reliance on his subjective belief of reasonableness.[40]

This Court has also held when interpreting insurance contracts that the use of the term "reasonably" requires the application an objective standard unless it is used in reference to a particular person's point of view or expectation under certain circumstances.[41] In the companion cases of *Allstate Ins Co v Freeman* and *Metro Prop & Liability Ins Co v DiCicco*,[42] this Court distinguished between language identifying objective and subjective standards in exclusionary insurance clauses. In *Freeman*, this Court unanimously held that the phrase "reasonably be expected" unambiguously directed the use of an objective standard of expectation.[43] In *DiCicco*, a majority of this

---

[38] *Nasser v Auto Club Ins Ass'n*, 169 Mich App 182, 186; 425 NW2d 762 (1988).

[39] *Id*.

[40] *Nasser*, 435 Mich at 48-50.

[41] Inasmuch as the no-fault act is statutorily mandated insurance coverage, we find it appropriate to seek guidance from insurance contract caselaw in regard to the meaning of the word "reasonably."

[42] *Allstate Ins Co v Freeman*, 432 Mich 656, 672; 443 NW2d 734 (1989).

[43] *Id*. at 688 (opinion by RILEY, C.J.); *id*. at 709 (opinion by BOYLE, J.); *id*. at 721 (opinion by ARCHER, J.).

15

Court applied a subjective standard to an insurance policy that excluded "bodily injury or property damage which is either expected or intended from the standpoint of the insured."[44]

More recently, in *Allstate Ins Co v McCarn (After Remand)*, we addressed an insurance policy that excluded coverage for damage that "may reasonably be expected to

[44] *Id*. at 672 (opinion by RILEY, C.J.); *id*. at 710 (opinion by BOYLE, J.); *id*. at 721 (opinion by ARCHER, J.). In *Fire Ins Exch v Diehl*, 450 Mich 678, 684; 545 NW2d 602 (1996), this Court addressed an insurance policy provision excluding "'[a] sudden event, including continuous or repeated exposure to the same conditions, resulting in bodily injury or property damage neither expected nor intended by the insured.'" The Court noted the provisions in both *Freeman* and *DiCicco*, then stated that,

> [in] [e]xplaining the distinction, [Chief] Justice BOYLE noted that the [*Freeman*] policy required an objective standard because, of the two exclusionary phrases in the policy, the first exclusionary phrase applied to injury "reasonably" expected, and the policy counterpoised the first exclusionary phrase to the second phrase that applied if the injury was "in fact intended." Therefore, the first phrase must require application of an objective standard or the word "reasonably" loses its meaning and the second exclusionary phrase is redundant. On the other hand, the policy exclusion from the [*DiCicco*] policy did not contain the word "reasonably," but instead employed the phrase "from the standpoint of the insured." This language required application of a subjective standard. [*Id*. at 685 (citations omitted).]

The *Diehl* Court stated that the policy in question was "somewhere between the two policies at issue in *Freeman* and *DiCicco*," noting that, "[a]lthough the policy does not employ the term 'reasonably,' the phrase 'from the standpoint of the insured' is also absent." *Id*. The *Diehl* Court nonetheless held that "[t]he manner in which the policy employs the phrase 'by the insured' suggests that the emphasis of the policy is on whether the insured expected or intended the injury" and thus applied a subjective analysis. *Id*. In further support, the *Diehl* Court noted that a subjective approach to determining reasonableness is appropriate if the policy expressly directed consideration of the insured's subjective expectations. *Id*. at 685-686, quoting *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 567-568; 489 NW2d 431 (1992) (holding that a policy exclusion for injury "expected or intended by an insured person" is unambiguous and requires a subjective standard) (quotation marks omitted).

result" from an insured's intentional or criminal acts.[45]  Because the contract used the phrase "reasonably expected," six members of this Court agreed that the contract required the application of an objective standard.[46]

The statutory provision at issue in this case uses the term "reasonably," and there is no statutory language suggesting that "reasonably" should be determined on a subjective basis.  Most indicative that an objective standard applies is the absence of language providing for any particular point of view, such as "from the standpoint of the insured" or "by an insured person."  Thus, although "reasonably necessary" is a broadly worded phrase, we conclude that this phrase must be assessed by using an objective standard.[47]

## E.  AN EXPERIMENTAL SURGICAL PROCEDURE CANNOT BE REASONABLY NECESSARY IF IT IS NOT EFFICACIOUS

Having determined that the term "reasonably necessary" must be assessed from an objective perspective, we next consider what it is that must be reasonably necessary under MCL 500.3107(1)(a): "products, services and accommodations" that are provided

---

[45] *Allstate Ins Co v McCarn (After Remand)*, 471 Mich 283, 289; 683 NW2d 656 (2004).

[46] *Id*. at 290, 297 (WEAVER, J. dissenting); *id*. at 302 (YOUNG, J., dissenting).  Justice CAVANAGH concurred in the result only.  We note a Court of Appeals decision, *Allstate Ins Co v Keillor (On Remand)*, 203 Mich App 36, 39-40, 511 NW2d 702 (1993), in which an objective standard was applied to a contractual exclusion for harm that "'may reasonably be expected to result from the intentional . . . acts of an insured person or which is in fact intended by an insured person.'"

[47] We note with approval the Court of Appeals' conclusion that evidence of the effects of a medical treatment on a plaintiff's condition, whether positive or negative in a particular case, is the type of post hoc evidence that is inconsistent with making an objective determination of whether medical treatment was "reasonably necessary."  *Krohn*, unpub op at 4 n 2.

"for an injured person's care, recovery, or rehabilitation."[48] Thus, a service, product, or accommodation must be (1) objectively reasonable and (2) necessary for an insured's care, recovery, or rehabilitation.[49] If, as in this case, the service under consideration is an experimental surgical procedure, the insured must present evidence that the surgery may result in care, recovery, or rehabilitation. In other words, there must be evidence that the surgery is efficacious. Further, because a surgery involves the exercise of medical judgment,[50] the efficacy determination must be based on objective and verifiable medical evidence. Experimental surgical procedures lacking objective and verifiable medical evidence of their efficacy cannot be "reasonably necessary" simply because it cannot be shown to effect the insured's care, recovery, or rehabilitation. To interpret MCL 500.3107(1)(a) as allowing reimbursement for nonefficacious experimental treatments "for an injured person's care, recovery, or rehabilitation" would be to read the phrase "reasonably necessary" out of this provision.[51]

---

[48] MCL 500.3107.

[49] *Nasser*, 435 Mich at 50.

[50] See *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411; 423-424; 684 NW2d 864 (2004).

[51] Indeed, plaintiff's counsel conceded this point at oral argument when acknowledging that treatment with a placebo could not be considered "reasonably necessary" under the no-fault act. A placebo is "a pharmacologically inactive substance or a sham procedure administered as a control in testing the efficacy of a drug or course of action." *Random House Webster's College Dictionary* (2000). While a placebo may cause a subjective effect of "lessening of symptoms," see *id*. (defining "placebo effect"), the administration of a placebo is decidedly without objective efficacy. Like a placebo, treatments such as the procedure here that lack efficacy can provide no basis for concluding that they were "reasonably necessary" for an injured person's care, recovery, or rehabilitation.

18

Requiring the minimum threshold of efficacy in the context of experimental surgical procedures is consistent with our precedent regarding nonmedical allowable expenses. In *Griffith*, for example, we rejected the proposition that insurers were "obligated to pay for any expenses that an injured person would otherwise be provided in an institutional setting as long as they are remotely related to the person's general care."[52] Rather, we concluded that coverage "requires that allowable expenses be causally connected to a person's injury."[53] We also emphasized that "the statute specifically limits compensation to charges for products or services that are reasonably necessary '*for an injured person's* care, recovery, or rehabilitation[,]' . . . suggest[ing] that 'care' must be related to the insured's injuries."[54] Just as *Griffith* required that expenses for food actually be related to a person's injury, so also do we require here that expenses for experimental medical treatment actually be for an injured person's care, recovery, or rehabilitation. This requires, at a minimum, that services be efficacious in an injured person's care, recovery, or rehabilitation.

If a surgical procedure is experimental, an insured cannot establish its reasonable necessity under MCL 500.3107 unless expert testimony indicates that the surgery presents a reasonable chance that it will be efficacious in the injured person's care, recovery, or rehabilitation. Contrary to the Court of Appeals' holding in this case, an insured is not required to prove that an experimental surgical procedure gained general

---

[52] *Griffith*, 472 Mich at 539.

[53] *Id*. at 530-531.

[54] *Id*. at 534.

19

acceptance in the medical community before its reasonable necessity becomes a question for consideration by the trier of fact.[55] MCL 500.3107(1)(a) does not require that medical treatment be shown to have gained general acceptance within the medical community. Rather, an insured must present objective and verifiable medical evidence that medical treatment is efficacious in an injured person's care, recovery, or rehabilitation.[56] If there is objective and verifiable evidence that an experimental surgical procedure is

---

[55] See *Krohn*, unpub op at 4. The Court of Appeals' reliance on *SPECT Imaging* was misplaced. In that case, the Court addressed whether a particular form of brain imaging was a reasonably necessary service under MCL 500.3107. *SPECT Imaging*, 246 Mich App at 574. The Court remanded for the trial court to conduct an evidentiary hearing to determine whether expert testimony and evidence relating to brain imaging were admissible under MRE 702. *Id*. at 578. The Court of Appeals did not require that brain imaging equipment be shown to have gained acceptance in the medical community. Rather, only the expert testimony or evidence offered in support of the brain imaging and the inferences therefrom had to have gained acceptance in the medical community before brain SPECT imaging would be considered reasonably necessary under MCL 500.3107. *Id*. at 578-579. *SPECT Imaging* expressly stated that

> [i]f the court determines that the expert testimony and evidence relating to [brain] SPECT imaging satisfy the standards of MRE 702 and [the general-acceptance requirement], and are therefore admissible at trial, the ensuing determination, whether brain SPECT imaging was a reasonably necessary expense in the treatment of defendants' insureds pursuant to MCL 500.3107(1)(a), is a question reserved for the trier of fact. [*Id*. at 579.]

We reject the proposition that a proposed product, service, or accommodation must have gained general medical acceptance to be compensable.

[56] We emphasize that evidence of efficacy is not, by itself, sufficient in every case to establish reasonable necessity or no-fault liability; instead, our opinion makes clear that efficacy is a minimum threshold standard that, if demonstrated by a plaintiff, precludes judgment as a matter of law on this particular issue. As with threshold standards generally, efficacy as demonstrated through objective and verifiable medical evidence is merely the first step to proving liability when considering the unique facts and circumstances of each case.

efficacious, the finder of fact can begin to make an informed decision in regard to whether the treatment was reasonably necessary by considering whatever factors were relevant in that case, which may include but are not limited to the severity and chronicity of the condition, the outcomes of any previous treatments, the likelihood that alternative treatments would be efficacious, a personal physician's recommendation in conjunction with the a patient's preference, and both the short-term and long-term risks and benefits.[57] Absent objective evidence to establish that the experimental surgical procedure is at least efficacious, there would not exist a material question of fact about whether the medical treatment was reasonably necessary to the care recovery or rehabilitation of an insured.[58]

We also observe that MRE 702 imposes an obligation on the trial court to ensure that any expert testimony or scientific evidence admitted at all stages of a proceeding is reliable.[59] "While the exercise of this gatekeeper role is within a court's discretion, a trial

---

[57] Notably, the parties' attorneys at trial elicited evidence in regard to several of these factors. Accordingly, we believe that attorneys of record are in the best position to propose factors that are most relevant to establishing whether a minimally efficacious treatment is "reasonably necessary."

[58] This opinion does not in any way prevent no-fault insureds from themselves paying for procedures that are not "reasonably necessary" or entering into insurance contracts that provide broader coverage.

[59] *Edry v Adelman*, 486 Mich 634, 639-642; 786 NW2d 567 (2010). We have consistently held that medical issues raised in medical malpractice actions are not within the common experience and understanding of jurors, and they thus require the assistance of expert testimony. See, e.g., *Wilson v Stilwill*, 411 Mich 587, 611; 309 NW2d 898 (1981); see generally *Bryant*, 471 Mich 411; *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26; 594 NW2d 455 (1999).

21

judge may neither 'abandon' this obligation nor 'perform the function inadequately.'"[60] The trial court must specifically ensure that expert testimony is based on sufficient facts or data, the product of reliable principles and methods, and that the witness has applied the principles and methods reliably to the facts of the case.

### F. THE PROCEDURE WAS NOT REASONABLY NECESSARY FOR THE CARE, RECOVERY, OR REHABILITATION OF PLAINTIFF

In this case, plaintiff failed to present evidence to establish that the experimental surgical procedure at issue presented him with an objectively verifiable chance that it would be efficacious in his care, recovery, or rehabilitation. Therefore, defendant was entitled to judgment as a matter of law because plaintiff did not meet the minimum threshold for recovery.

Plaintiff relied on the testimony of two expert witnesses, Dr. Hinderer of the RIM and Dr. Lima,[61] to establish that the procedure was "reasonably necessary." Dr. Hinderer's testimony cast doubt on whether the procedure was efficacious in plaintiff's care, recovery, or rehabilitation.[62] In particular, Dr. Hinderer did not endorse,

---

[60] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004) (citation omitted). In this case, however, defendant waived this issue by failing to object. *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004) (holding that "a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention").

[61] Dr. Lima is a neurologist, not a surgeon, and he did not participate in plaintiff's surgery. Dr. Lima, however, described himself as a member of plaintiff's surgical team.

[62] During oral argument, plaintiff's counsel conceded that, at best, Dr. Hinderer took a neutral stance with regard to the procedure. In light of this admission, Dr. Hinderer's testimony can hardly be found to support the conclusion that the procedure was reasonably necessary for plaintiff's care, recovery, or rehabilitation.

recommend, or prescribe the procedure to plaintiff.[63]  Dr. Hinderer testified that the

procedure is not regarded as necessary in his field of medicine and that "[i]t's certainly

not standard of practice given its experimental nature."  More importantly, when asked

whether the surgical procedure increased the chances of an injured person's potential for

recovery, Dr. Hinderer agreed with defense counsel's statement that "we don't know the

outcomes yet because this is such a new procedure."

Further, Dr. Hinderer's testimony actually confirmed that the decision to undergo

the procedure was purely subjective.  He candidly testified that

> there are individuals who would not even remotely consider this procedure;
> there are others who don't even want to hear anything negative about it
> because they want to pursue it, and everything in between, so it—you
> know, relative to someone, you know, placing oneself in a situation like
> this, you know, it's a personal choice, but certainly understandable . . . .

---

[63] Dr. Hinderer did testify that the procedure was approved by the "Geneva Protocol," which plaintiff claims is similar to FDA approval.  We note that this was likely intended to be a reference to the Declaration of Geneva, which, together with the Declaration of Helsinki, governs the ethics of human medical research under principles set forth by the World Medical Association.  See World Medical Association, WMA Declaration of Helsinki—Ethical Principles for Medical Research Involving Human Subjects, <http://www.wma.net/en/30publications/10policies/b3/index.html> (accessed July 20, 2011).  In any event, Dr. Hinderer's testimony only addressed the "Geneva Protocol" in regard to whether it was safe and ethical for humans to undergo the procedure for purposes of research.  In comparing the FDA's approval process to the "Geneva Protocol," Dr. Hinderer testified that the "FDA really is concerned about safety first and then efficacy, and the FDA does it in a staged set of approaches or phases, Phase [I] being a safety trial, Phase [II] being continued safety monitoring and early investigation of efficacy, Phase [III] being primarily focused on efficacy . . . ."  Dr. Hinderer did not suggest that the "Geneva Protocol" had something comparable to Phase II FDA review for investigation of efficacy, or that the procedure had been reviewed for efficacy in any manner.  In fact, Dr. Hinderer admitted that he had not actually tried to compare the relative criteria of the "Geneva Protocol" and the phases of review preceding FDA approval.

Taken in the light most favorable to plaintiff, Dr. Hinderer's testimony does not provide any evidence that the experimental procedure presented plaintiff a medically verifiable chance that it would be efficacious in his care, recovery, or rehabilitation. Accordingly, Dr. Hinderer's testimony did not provide an objective basis from which a jury could conclude that the experimental surgical procedure was reasonably necessary.

Dr. Lima's testimony does not save plaintiff's claim.[64] Plaintiff maintains that the procedure afforded him the possibility or opportunity to recover as much function as possible below his injury site. Dr. Lima did indeed claim that the procedure was reasonably necessary if plaintiff wanted the opportunity to recover some function below the injury site. And plaintiff has clearly relied on Dr. Lima's affirmative answer to counsel's question whether, "as a result of the procedure, the possibility exists that [plaintiff] may regain some level of function below the injury site[.]"

This possibility, however, cannot be measured without objective evidence establishing efficacy in the first place. Further, as with the legal standard for establishing causation, the mere possibility of efficacy is not enough, and "when the matter remains one of pure speculation or conjecture, . . . it becomes the duty of the court to direct a verdict for the defendant."[65] While Dr. Lima articulated his theory, he failed to present medical evidence to support it. Whatever research he may have conducted, it was

---

[64] The dissent relies on Dr. Lima's testimony regarding the procedure's conformity with the European Commission's guidelines regarding clinical procedures. There was no evidence that these guidelines verify the efficacy of any given procedure. At most, these guidelines suggest that the procedure may be performed safely.

[65] *Weymers v Khera*, 454 Mich 639, 563 NW2d 647 (1997).

unsupported by any controlled studies, it had not been subjected to peer review, and the medical evidence had not been not debated in scholarly publications. Dr. Lima did not base his testimony on any verifiable evidence that undergoing the procedure would be efficacious. The record reflects that his testimony, at best, reflects his personal belief, or hope, that many of the patients who undergo the procedure improve. This is clearly established by the fact that Dr. Lima was very "surprised" by the "quite unexpected" results of plaintiff's procedure. In sum, Dr. Lima's testimony also fails to provide an objective basis by which a jury could conclude that the experimental surgical procedure was reasonably necessary for plaintiff's care, recovery, or rehabilitation.[66]

## G. RESPONSE TO THE DISSENT

The dissent's declaration that "[t]oday's decision rewrites [MCL 500.3107] to require that a procedure be 'medically necessary' or 'medically appropriate' in order for an insured to be reimbursed by his or her insurer"[67] is patently false. Nowhere in this opinion, except in response to the dissent, will you find the phrases "medically

---

[66] Contrary to the dissent's assertion, we are not holding that plaintiff's subjective decision to undergo the procedure was unreasonable. Instead, we are simply holding that because plaintiff presented no objective evidence that the procedure would have any beneficial effect on his "care, recovery, or rehabilitation," he failed to satisfy the requirement of MCL 500.3107(1)(a) that the procedure be "reasonably necessary [for his] care, recovery, or rehabilitation." Under *Nasser*, 435 Mich at 55, and this Court's more recent statement in *Wilcox v State Farm Mut Auto Ins Co*, 488 Mich 1011 (2010), we agree with the dissent that in "most cases" a jury is the proper vehicle to determine whether a procedure is reasonably necessary. However, as we hold here, medical treatment that lacks objective and verifiable evidence of efficacy cannot *ever* be considered "reasonably necessary," and thus the issue should be decided as a matter of law.

[67] *Post* at 11.

necessary" or "medically appropriate." After falsely ascribing these standards to us, the dissent uses them to set up the straw-man argument that we are thwarting the will of the people by enacting standards that were rejected when 1993 PA 143 was rejected by referendum. This is also patently false.

## 1. WE ARE INTERPRETING MCL 500.3107

The dissent claims that our opinion adds language to MCL 500.3107. We obviously disagree with this characterization. We believe that the dissent fails to give meaning to the portion of the provision that states "for an injured person's care, recovery, or rehabilitation" by concluding that evidence of a treatment's efficaciousness is not required to prove that it is reasonably necessary. A treatment or procedure that has not been shown to be efficacious can be neither "reasonable" nor "necessary" under the no-fault act.

Our interpretation of MCL 500.3107 gives meaning to the phrase "reasonably necessary . . . for an injured person's care recovery or rehabilitation," and, in doing so, we define the minimum amount of evidence that must be presented on the question before the matter becomes a genuine and material question of fact sufficient to be submitted to a jury for its determination.[68] We merely conclude that the reasonably

---

[68] The dissent cites *Owens v Auto Club Ins Ass'n*, 44 Mich 314, 326; 506 NW2d 850 (1993), for the proposition that "an issue of fact still existed for the jury to resolve" "even if doubt was cast by one of the two assessing physicians . . . ." *Post* at 8. Unlike the situation in *Owens*, plaintiff's expert witnesses here either independently or cumulatively failed to testify that objective and verifiable evidence existed to establish that the experimental surgical procedure was efficacious, and therefore reasonably necessary to plaintiff's care, recovery, or rehabilitation. Because no evidence was presented by any expert to create a genuine issue of fact, the principles of *Owens* are not implicated by this case.

necessary standard cannot be met when there is no evidence that medical treatment will have any beneficial effect on the "injured person's care, recovery, or rehabilitation."

It is a bedrock legal principle that "[i]t is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule."[69] This Court stated that "it is necessary . . . that the law shall be known and certain, and shall not depend on each jury that tries a cause."[70] It is axiomatic that courts decide questions of law and juries apply the law given them to the facts as they have found them. This principle is reflected in our model civil jury instructions, and the trial court instructed the jury consistently with those instructions.[71] We do not add language to MCL 500.3107(1)(a), but expound upon the phrase "reasonably necessary . . . for an injured person's care recovery or rehabilitation" to provide essential legal guidance.[72]

---

[69] *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803).

[70] *Hamilton v People*, 29 Mich 173, 191 (1874).

[71] See M Civ JI 2.01 ("You must take the law as I give it to you," and "Your responsibility as jurors is to decide what the facts of the case are.").

[72] As previously stated, outside the litigation context, the dissent's position provides absolutely no guidance for how to determine the issue of reasonable necessity. By providing meaning to MCL 500.3107, this opinion provides guidance to all members of the relevant community—insureds, insurance claims adjusters trying to determine whether a medical procedure is covered, lawyers, medical experts, and so forth—to know that, as with other personal protection insurance benefits, there must be objective and verifiable evidence of efficacy before coverage is contemplated under the no-fault act. We believe that all interested parties are better off knowing their responsibilities and liabilities before the necessity of litigation arises. The dissent's position provides no guidance whatsoever—not to the community generally, and not even to juries who must decide questions of "reasonable necessity."

27

We find overwrought the dissent's protestations regarding the so-called "stringent" standard that the dissent claims this opinion articulates. Again, we merely hold that an insured must establish that medical treatment is efficacious in his or her care, recovery, or rehabilitation. We conclude that this standard is entirely consistent with the common meaning of the phrase "reasonably necessary . . . for an injured person's care, recovery, or rehabilitation." On the other hand, the dissent's position that a reasonably necessary treatment is any treatment that a person hopes could possibly work falls far short of any commonly accepted meaning of "reasonably necessary . . . for an injured person's care, recovery, or rehabilitation." The dissent's standard would allow a nonefficacious treatment—which is worthless—to be considered "reasonably necessary" for the sole reason that an expert witness offered an opinion that the medical treatment is reasonably necessary. For the same reasons that we caution trial courts not to "admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert,"[73] we believe that what constitutes a reasonably necessary medical treatment cannot solely be based on the ipse dixit of a physician. And while we recognize that our standard, which requires evidence of efficacy, is more imposing than the dissent's standard of let the jury figure it out, it bears repeating that medical treatments, like *any* other personal protection insurance benefit, must be efficacious to be reasonably necessary. Ignoring this basic principle sanctions the dissent's anything-goes approach, whereby every insured's demand for payment would inexplicably become a question of

---

[73] *Gilbert*, 470 Mich at 783, quoting *General Electric v Joiner*, 522 US 136, 146; 118 S Ct 512; 139 L Ed 2d 508 (1997).

fact and no-fault benefits would be paid for treatments not even shown to be reliable or effective, let alone reasonable or necessary.

## 2. 1993 PA 143

The dissent maintains that our interpretation of MCL 500.3107(1)(a) thwarts the will of the voters as expressed in the 1994 general election, in which the voters rejected 1993 PA 143. But, as explained earlier, in order to advance this argument, the dissent must ascribe to us legal standards not adopted in this opinion. Further, we are unfamiliar with a method of statutory interpretation that commences interpretation of an existing statute not by reviewing the words of that statute, but instead by examining the language of one rejected by referendum. Employing this method of interpretation, the dissent maintains that an experimental surgical procedure may never be deemed unreasonable as a matter of law and that a jury must always determine what is reasonable and necessary, regardless of the evidence presented at trial.

1993 PA 143 would indeed have amended MCL 500.3107 to state in subsection (4)(c) that "[e]xpenses within personal protection insurance coverage shall not include experimental treatment or participation in research projects." But it defies logic to presume that because a total bar on experimental treatments was rejected by the voters, the reasonableness and necessity of all experimental treatments must be resolved by a jury. Following the dissent's reasoning, if a medical doctor opined that treatments such as apricot pit theory, ear candling, homeopathy, magnet therapy, and psychic surgery could possibly give an insured a chance to recover, a jury would have to resolve whether

29

those treatments were reasonable and necessary to the care, recovery, or rehabilitation of the insured.[74] This could not possibly be the effect of the rejection of 1993 PA 143.

Further, [a]t least one Michigan court has declined to adopt the method of statutory construction adopted here by the dissent. In *Michigan Chiropractic Council v Office of Fin & Ins Servs Comm'r*,[75] the Court of Appeals was asked to assume that the rejection by ballot referendum of 1993 PA 143 amounted to a rejection by the voters of every single aspect of the act. The Court of Appeals did not accept this argument. The Court of Appeals observed that "1993 PA 143 made comprehensive changes to Michigan's no-fault insurance scheme. Because the referendum rejected the act in its entirety, it has little bearing on the [specific issue presented in] this case."[76] We agree with the *Chiropractic Council* panel that 1993 PA 143 was a comprehensive insurance reform bill, and one can only speculate whether the rejection of 1993 PA 143 signified that voters expected every type of experimental treatment to be covered under the no-fault act. Indeed, the language on the ballot proposal did not even mention experimental treatment.[77] The dissent engages in guesswork and, on this basis, believes that Michigan

---

[74] Surely the dissent would not require an insurer to reimburse the cost of placebo pills. Yet, the dissent would hold that there remains a question of fact whether the experimental surgical procedure here is reasonably necessary, even though plaintiff presented no objective evidence that it has any more demonstrated efficacy than a placebo.

[75] *Michigan Chiropractic Council v Office of Fin & Ins Servs Comm'r*, 262 Mich App 228; 685 NW2d 428 (2004), vacated 475 Mich 363; 716 NW2d 561 (2006).

[76] *Chiropractic Council*, 262 Mich App at 246 n 12.

[77] The official ballot language stated:

voters intended its courts to rubber-stamp all determinations under the no-fault act, regardless of the paucity of evidence supporting a jury's finding and regardless of how unreasonable and unnecessary the expense may be. We base our opinion on the current law. We do not base it on what the law once was or could have been.

This case does not turn on any aspect of 1993 PA 143. As already stated, we reject defendant's claim that plaintiff cannot prevail merely because the procedure was experimental. We also reject the Court of Appeals' holding that an insured is required to prove that an experimental surgical procedure has gained general acceptance in the medical community before consideration by the trier of fact. The question whether an

---

### PROPOSAL C

#### A REFERENDUM ON PUBLIC ACT 143 OF 1993—AN AMENDMENT TO MICHIGAN'S AUTO INSURANCE LAWS

Public Act 143 of 1993 would:

1.) Reduce auto insurance rates by 16% (average) for six months for policyholders reducing personal injury (medical) insurance to $1 million. Extra coverage made available at added cost.

2.) Permit Insurance Commissioner to waive company's obligation to reduce rates if statutory formula would be in excess of 1989-1992 state average.

3.) Place limits on personal injury (medical) benefits.

4.) Limit fees paid to health care providers.

5.) Limit right to sue by setting higher standards for the recovery of damages for "pain and suffering" and prevent uninsured drivers and drivers over 50% at fault from collecting damages.

6.) Allow rate reductions for accident-free driving with the same insurer.

31

experimental treatment is reasonably necessary for an insured's care, recovery, or rehabilitation must be resolved by a fact-finder if the insured can present objective and verifiable medical evidence to support the conclusion that the treatment is efficacious. The dissent maintains that this is an illusory standard because, if objective and verifiable medical evidence of efficacy exists, "it is unclear how the procedure would still be termed 'experimental' or in the 'research' phase."[78] But the practices of the FDA establish that an efficacious treatment may nonetheless be experimental. The FDA has three phases of testing before a medical procedure or product receives full FDA approval. Phases II and III of the FDA process, in which the treatment is still experimental or in the research phase, focus on efficacy. This is but one example. And contrary to the dissent's representation, we do not hold that the objective and verifiable medical evidence must include "controlled studies subject to peer review or scholarly publications" supporting the science behind the surgery.[79] Likewise, we are in no way suggesting that data from the FDA are required. Rather, these are additional examples of objective and verifiable evidence that can establish efficacy. Presentation by an expert witness of any of this objective and verifiable evidence, even if opposed by several witnesses claiming the proposed medical treatment is not efficacious, is sufficient to sustain plaintiff's burden. Since we are not medical experts, we are not going to artificially limit the types of objective and verifiable evidence that a party may present to support its claim; instead, we simply note that there must be some evidence from the medical community that a

---

[78] *Post* at 13.

[79] *Post* at 11-12.

particular procedure would have some beneficial effect on a person's "care, recovery, or rehabilitation" in accordance with MCL 500.3107(1)(a).

## IV. CONCLUSION

We conclude that the question whether a product, service or accommodation is reasonably necessary for an injured person's care, recovery, or rehabilitation must be determined under an objective standard. We further conclude that when medical treatment is experimental, an insured seeking reimbursement for this treatment must present objective and verifiable medical evidence establishing that the treatment is efficacious. A treatment or procedure that has not been shown to be efficacious cannot be reasonable or necessary under the no-fault act. An insured's subjective belief that medical treatment is efficacious, reasonable, and necessary is not sufficient to create a question of fact. Viewed in the light most favorable to plaintiff, the objective and verifiable medical evidence presented at trial failed to establish that the experimental surgical procedure at issue in this case was any way efficacious in the care, recovery, or rehabilitation of plaintiff's injury.[80] Accordingly, we affirm the judgment of the Court of Appeals.

Brian K. Zahra
Robert P. Young
Stephen J. Markman
Mary Beth Kelly

---

[80] Because we hold that plaintiff cannot demonstrate that the procedure was "reasonably necessary" to his care, recovery, or rehabilitation, we need not address defendant's alternative argument that the procedure was not "lawfully rendered" and therefore not compensable under the no-fault act.

33

STATE OF MICHIGAN

SUPREME COURT

KEVIN KROHN,

      Plaintiff-Appellant,

v

No. 140945

HOME-OWNERS INSURANCE
COMPANY,

      Defendant-Appellee.

_____

HATHAWAY, J. (*dissenting*).

This case addresses whether a medical procedure performed on plaintiff to treat his severe accident-related spinal-cord injuries was "reasonably necessary" under MCL 500.3107(1)(a) of the no-fault act, MCL 500.3101 *et seq*. The majority holds that the procedure was not "reasonably necessary" and, in doing so, adds language to the no-fault act that was rejected by ballot referendum in 1994. The majority reaches its result by erroneously removing the determination of which expenses are "reasonably necessary" from the jury. Additionally, the majority's new judicially crafted definition of "reasonably necessary" elevates the standard for proving that treatment is "reasonably necessary" to one that is more stringent than MCL 500.3107(1)(a) requires. I respectfully dissent because today's decision erroneously changes the mandates of the no-fault act and replaces them with standards that are inconsistent with the language and history of that act. I would apply the statute as written and uphold the jury's finding that the procedure

performed on plaintiff was "reasonably necessary." Therefore, I would reverse the Court of Appeals' judgment and hold that plaintiff is entitled to reimbursement of the costs associated with the procedure.

This case involves plaintiff's request that his no-fault insurer, defendant Home-Owners Insurance Company, reimburse him for the expenses surrounding an experimental procedure that he underwent in Portugal. The procedure was performed to treat the serious spinal-cord injuries plaintiff had sustained in a motorcycle accident. The accident left plaintiff a paraplegic with no sensation in or control of his lower body, leaving him confined to a wheelchair and in need of assistance in urinating and defecating. His condition showed no improvement during the four years between his accident and the procedure. According to plaintiff's expert witness, plaintiff's condition improved following the procedure. However, defendant refused to pay for the procedure, arguing that it was not "reasonably necessary" for plaintiff's "care, recovery, or rehabilitation"[1] because it was experimental in nature.

During his jury trial, plaintiff presented testimony from Dr. Carlos Lima, a neurologist on the surgical team that performed the procedure. Dr. Lima testified that the procedure involved harvesting tissue containing stem cells from plaintiff's own sinus cavities and transplanting the tissue into the injured area of the spinal cord. Dr. Lima testified that this procedure fosters growth of new cells in the injured spinal cord, while avoiding the ethical and technical issues surrounding the use of embryonic stem cells.

---

[1] MCL 500.3107(1)(a).

2

Although the procedure had not been presented for approval by the federal Food and Drug Administration (FDA), Dr. Lima testified that it was conducted within the standards of the European Commission's guidelines regarding clinical procedures. The procedure was performed in a governmental hospital in Lisbon, Portugal, after the presiding physician had obtained approval from the hospital board. Dr. Lima testified that of the 110 patients who had undergone the treatment in his program, a majority of the patients showed improvement. Dr. Lima's testimony describing the success of the procedure included the following:

> *Q.* Have you had patients who have undergone this stem cell surgery recover their ability to walk?
>
> *A.* Not unassisted, but we have—and this is rule [sic] now for our patients to be walking assisted with a walker. That's the rule now for our patients.
>
> *Q.* Have some of your patients recovered movement below the injury site after this surgery?
>
> *A.* Yes.
>
> *Q.* Have some of the patients shown improvement in sensation below the injury site?
>
> *A.* Yes.
>
> * * *
>
> *Q.* Overall, would you describe—how would you describe the degree of success of the surgeries on patients?
>
> *A.* Well, maybe I'm not right person to say that, and that's why we want to publish the whole results of the patient, but I would say the majority of patients have some kind of improvement.

Plaintiff's treating doctor in the United States, Dr. Steven Hinderer, also testified concerning the reasonableness of the procedure, and responded to questioning as follows:

> *Q.* And based on everything you know about this surgery and in light of [plaintiff's] injury and with your experience with all the other patients that have undergone this surgery, did you consider it a reasonable form of treatment for [plaintiff] to have this surgery if his objective was to try to increase his recovery below the injury site?
>
> *  *  *
>
> *A.* Yes.

The jury found that the expenses related to the surgery in Portugal were reasonable charges for reasonably necessary products, services, and accommodations for plaintiff's care, recovery, and rehabilitation under the no-fault act. The Court of Appeals, however, reversed the jury's finding and ordered the trial court to enter a judgment in defendant's favor.[2] Plaintiff now appeals that decision.

The issue before this Court is whether an experimental medical procedure can be "reasonably necessary" for an injured person's care, recovery, or rehabilitation.[3] Deciding this issue requires application of MCL 500.3107(1)(a).

---

[2] *Krohn v Home-Owners Ins Co*, unpublished opinion per curiam of the Court of Appeals, issued January 26, 2010 (Docket No. 283862), p 6.

[3] Defendant also argues that the treatment was not "lawfully rendered" under MCL 500.3157 of the no-fault act because the procedure performed on plaintiff in Portugal has not been approved in the United States by the FDA. MCL 500.3157 provides in pertinent part that "[a] physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance . . . may charge a reasonable amount for the products, services and accommodations rendered."

4

When interpreting a statute, we follow the established rules of statutory construction. The purpose of statutory construction is to discern and give effect to the intent of the Legislature.[4] In doing so, we first look to the actual language of the statute.[5] If a statute is clear and unambiguous, it must be enforced as written and no further judicial construction is allowed.[6] Simply stated, we must avoid a construction that would render any part of the statute nugatory,[7] and similarly, we are "not free to add language to a statute or to interpret a statute on the basis of this Court's own sense of how the statute should have been written."[8] Further, a statute must be read as a whole,[9] and while individual words and phrases are important, the words and phrases should be read in the

In this case, I believe that the procedure was likely "lawfully rendered" because it was lawful in Portugal, where it was performed. Therefore, I find persuasive the Court of Appeals dissent's conclusion that adopting defendant's position would require that the statute would have to "be rewritten to provide coverage for treatment 'lawfully rendered in the U.S. and approved by the FDA.'" *Krohn*, unpub op at 10 (FORT HOOD, J., dissenting). Because the Legislature did not incorporate such language into the statute, it appears that the procedure was "lawfully rendered" under MCL 500.3157 because it was lawful in Portugal. However, because the majority does not opine on this argument, I do not find it necessary to consider this argument in detail in this dissent.

[4] *Potter v McLeary*, 484 Mich 397, 410; 774 NW2d 1 (2009), citing *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999).

[5] *Id.*

[6] *Sun Valley*, 460 Mich at 236.

[7] *People v McGraw*, 484 Mich 120, 126; 771 NW2d 655 (2009), citing *Baker v Gen Motors Corp*, 409 Mich 639, 665; 297 NW2d 387 (1980).

[8] *Kirkaldy v Rim*, 478 Mich 581, 587; 734 NW2d 201 (2007) (CAVANAGH, J., concurring).

[9] See *Sun Valley*, 460 Mich at 237.

5

context of the entire legislative scheme.[10] And "when courts interpret the no-fault act in particular, they are to remember that the act is remedial in nature and must be liberally construed in favor of the persons intended to benefit from it."[11]

The statute at issue, MCL 500.3107(1), provides in pertinent part:

> (1) Except as provided in subsection (2), personal protection insurance benefits are payable for the following:
>
> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. Allowable expenses within personal protection insurance coverage shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations except if the injured person requires special or intensive care, or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00.

The majority holds that in order for an expense related to an experimental surgical procedure to be "reasonably necessary," a court must first determine as a matter of law that there is "objective and verifiable medical evidence establishing that [the experimental surgical procedure] is efficacious."[12] Further, the majority holds that plaintiff did not meet the "objective and verifiable medical evidence" standard because Dr. Lima's research "was unsupported by any controlled studies, it was not subject to

---

[10] *Herman v Berrien Co*, 481 Mich 352, 366; 750 NW2d 570 (2008).

[11] *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 28; 528 NW2d 681 (1995), citing *Gobler v Auto-Owners Ins Co*, 428 Mich 51, 61; 404 NW2d 199 (1987).

[12] *Ante* at 2.

6

peer review, and the medical evidence was not debated in scholarly publications."[13] Thus, the majority's new standards add language to the statute that is simply not there.

In this case, there was testimony from two doctors who assessed plaintiff's condition before the procedure was performed. Dr. Lima testified that it would be necessary for plaintiff to undergo the procedure in order to have a chance at recovery. Dr. Hinderer did state that he was not able to recommend the procedure to plaintiff because the procedure was not an authorized procedure in the United States, but he also testified that the procedure was a reasonable form of treatment for plaintiff. The majority characterizes Dr. Hinderer's testimony as casting doubt on the efficacy of the procedure because "Dr. Hinderer did not endorse, recommend, or prescribe the procedure to plaintiff."[14] This characterization is erroneous.

The majority dismisses the fact that the facility where plaintiff was treated by Dr. Hinderer, the Rehabilitation Institute of Michigan, has a professional relationship with Dr. Lima's program in Portugal pursuant to which the Rehabilitation Institute screens patients to determine whether they meet the criteria to be eligible for the procedure. Dr. Lima's program has performed the procedure on 110 patients from around the world. According to Dr. Lima, the Rehabilitation Institute has screened nearly 60 patients for the procedure. Of the 60 patients from the Rehabilitation Institute, 40 were Dr. Hinderer's patients. Thus, I disagree with the majority's assertion that

---

[13] *Ante* at 24-25.

[14] *Ante* at 22-23.

Dr. Hinderer cast doubt on the efficacy of the procedure. More than a third of the patients in the worldwide program were patients of Dr. Hinderer, which, when viewed in a light most favorable to the plaintiff,[15] suggests that Dr. Hinderer does not doubt the effectiveness of the procedure. However, even if doubt was cast by one of the two assessing physicians, an issue of fact still existed for the jury to resolve under *Owens v Auto Club Ins Ass'n*, 444 Mich 314, 326; 506 NW2d 850 (1993).[16] Today's decision erroneously holds that the jury should not have decided this genuine issue of material fact.

The majority holds that the jury incorrectly concluded that the procedure was "reasonably necessary." In reaching this result, the majority disregards much of the actual testimony presented.[17] For instance, Dr. Lima testified that without the procedure, "there's no possibility for [plaintiff] to have any recovery with such [an injury] which is not just functionally complete, but it was anatomically very destructive and complete

---

[15] This case involves defendant's motion for a directed verdict. "The standard of review for judgments notwithstanding the verdict requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Orzel v Scott Drug Co*, 449 Mich 550, 557; 537 NW2d 208 (1995), citing *Wadsworth v New York Life Ins*, 349 Mich 240; 84 NW2d 513 (1957).

[16] *Owens* held that the presentation of competing professional opinions from doctors who assessed the plaintiff is enough to create a question of fact regarding whether the procedure was "reasonably necessary." *Owens*, 444 Mich at 326.

[17] While the majority acknowledges that Dr. Lima testified that he "would say the majority of patients showed some improvement," the majority mischaracterizes this testimony as a "guess" that "hardly demonstrates that a 'majority of patients showed improvement.'" *Ante* at 7 n 5. However, as the actual testimony illustrates, the majority's characterization of these facts is not supported by the record. Further, the jury apparently disagreed with the majority's characterization of Dr. Lima's statements.

8

also." Dr. Lima's statement shows that a doctor who assessed plaintiff's condition found that there was no possibility of recovery before the procedure.

The majority argues that Dr. Lima's testimony suggests merely "the possibility or opportunity to recover" and that a "possibility . . . cannot be measured without objective evidence establishing efficacy in the first place."[18] This argument is at odds with the actual language of MCL 500.3107(1)(a) because it contains standards not found in the language of the statute. The statute only requires a procedure to be "reasonably necessary" to qualify as an allowable expense. Therefore, the analysis should be limited to whether a procedure was "reasonably necessary" under the commonly understood meaning of those words.[19] The statute does not contain any language limiting the basis of

---

[18] *Ante* at 24.

[19] "Reasonable" is defined as "1. Capable of reasoning; *rational*. 2. Governed by or in accordance with reason or *sound thinking*. 3. Within the bounds of *common sense*[.]" *The American Heritage Dictionary of the English Language, New College Edition* (1981) (emphasis added). "Necessary" is defined as "1. Needed for the continuing existence or functioning of something; essential; indispensible . . . . 2. *Needed to achieve a certain result or effect*; requisite: *the necessary tools*." *Id.* (emphasis added). When the two terms are read together, "reasonably necessary" indicates something that is essential and proper under the circumstances.

The majority rejects my analysis, claiming that it offers no legal standard for determining whether a procedure is "reasonably necessary" under MCL 500.3107(1)(a). However, as remains clear throughout my analysis, this dissent merely applies our rules of statutory interpretation, which require that these words be given their common meaning when the statute does not provide a technical definition for them. MCL 8.3a. Thus, the majority's accusation is devoid of merit, given that I conclude that the determination should be based on the commonly understood meaning of the words "reasonable" and "necessary," rather than injecting a statutorily unsupported requirement that the procedure be "medically" reasonably necessary.

9

a "reasonably necessary" determination to objective and verifiable medical data, as is required by today's decision.

The majority also errs because it misconstrues the meaning of the term "reasonably necessary." Without any statutory support, it interprets the word "reasonably" to mean "objective and verifiable." The majority then declares that the term "necessary" creates a strict standard requiring "evidence" of "efficacy."[20] The evidence that the majority refers to can only be satisfied with thorough evidence from the "medical

---

Thus, I would hold that, as used in MCL 500.3107(1)(a), a procedure is "reasonably necessary" if a reasonable person would conclude that the procedure is a "necessary" tool for the "injured person's care, recovery, or rehabilitation." And, as discussed in this dissent, in most cases a jury is in the best position to apply the common sense necessary to make this determination, and can make that determination using a number of factors. It is clear that applying the commonly understood meaning of the statutory phrase "reasonably necessary" is more consistent with the legislative intent and does provide ample guidance to parties and courts.

[20] Turning the "reasonably necessary" standard into one that requires objective and verifiable proof of efficacy may prove troubling for this Court in future cases, considering that the "reasonably necessary" standard appears in more than 100 Michigan statutes, our court rules, and the Michigan Rules of Professional Conduct. For example, will the majority's new standard for "reasonably necessary" apply in cases regarding revenue sharing, MCL 141.913b(3), regional convention facilities, MCL 141.1369(10)(d), the tender of goods, MCL 440.2503(1)(a), funds transfers, MCL 440.4802(1)(b), dealer agreements with auto manufacturers, MCL 445.1575(2), nonprofit corporations, MCL 450.2443(2)(c), churches, MCL 458.257, cooperative savings associations, MCL 491.314, airport facilities, MCL 259.118(3)(c), farm produce fees, MCL 285.321(5), the competence of a criminal defendant, MCL 330.2020(1), water and sewer board decisions, MCL 333.12713(2), the application of the rules of evidence, MRE 803(4), and attorney misconduct, MRPC 1.6(c)(3)?

community."[21]  However, the statute before us does not contain the terms "objective," "verifiable," "evidence," "efficacy," or "medical community."

Under the majority's own stated principle, words cannot be read into this statute. In order to provide support for the majority's new standard, the statute would have to contain, at a minimum, language indicating that expenses are only allowable if they relate to procedures that are "proven to be efficacious by the medical community or the FDA." However, such language is not in the no-fault act.  For all practical purposes, this is a "medically necessary" or "medically appropriate" standard, despite the majority's statements to the contrary.  Thus, today's decision rewrites the statute to require that a procedure be "medically necessary" or "medically appropriate" in order for an insured to be reimbursed by his or her insurer.

In response to this criticism, the majority proclaims that nowhere in its opinion does it use the phrases "medically necessary" or "medically appropriate," except in its response to this dissent.  But the majority need not invoke those magic words for it to be obvious to all that this is precisely what the majority's new standard requires.  A standard that requires the presentation of objective and verifiable medical evidence establishing

---

[21] The majority disregards the testimony concerning the success of other patients in Dr. Lima's clinical program.  As noted, the majority states that "[w]hatever research he may have conducted, it was unsupported by any controlled studies, it had not been subjected to peer review, and the medical evidence had not been debated in scholarly publications." *Ante* at 24-25.  Thus, under the majority's test requiring evidence proving the efficacy of the procedure, the standard is a heightened standard that cannot be met with a minimal threshold of supporting evidence, even when there is no evidence presented disproving the effectiveness of the procedure.

11

that a treatment is generally efficacious, based on controlled studies subject to peer review or scholarly publications, *is* a "medically necessary" standard. The majority's statements to the contrary do not change the practical reality of its new standard.

In reviewing the actual language of the statute, it is clear that the determination of whether a procedure is "reasonably necessary" involves analyzing whether the decision to undergo the procedure was within reason, in light of the testimony that plaintiff *would not recover* if he did nothing.[22] Moreover, it must not be forgotten that a jury of plaintiff's peers found that the procedure was "reasonably necessary" for plaintiff's "care, recovery, and rehabilitation." By making this broad decision today, the majority has turned a procedure that was found to be "reasonably necessary" for plaintiff's "care, recovery, or rehabilitation" into an unreasonable choice. In this case, the majority effectively asserts that it was unreasonable as a matter of law for this plaintiff to have pursued the only procedure that could possibly prevent him from being a paraplegic for the rest of his life.

Further, the majority states that "[t]he ultimate question whether the surgical procedure at issue here is a covered expense under the no-fault act does not turn on its status as experimental."[23] However, despite this statement, experimental procedures and

---

[22] See *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 548; 697 NW2d 895 (2005) (MARILYN KELLY, J., dissenting) ("Given the wide variety of circumstances under which injured parties seek no-fault benefits, the act provides for wide latitude in determining what benefits are reasonably necessary in a given situation.").

[23] *Ante* at 13.

12

participation in research projects are effectively excluded from coverage as a matter of law under the majority's new standard. The majority's standard requires objective and verifiable medical evidence proving a procedure's efficacy, but if such data were to exist, it is unclear how the procedure would still be termed "experimental" or in the "research" phase.

Despite the majority's protestations to the contrary, its decision today also abandons well-established precedent. In *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 54; 457 NW2d 637 (1990), this Court stated that "the question of whether expenses are reasonable and reasonably necessary is generally one of fact for the jury" and that summary disposition should only be granted when the reasonableness and necessity of a procedure can be determined with "certainty" when the evidence is viewed in the light most favorable to the nonmoving party.[24] In *Owens*, 444 Mich at 326, this Court stated that the presentation of competing professional opinions from doctors who assessed the plaintiff was enough to create a question of fact regarding whether the procedure was

---

[24] Citation and quotation marks omitted. *Nasser* instructed courts that unless it can be said "with certainty" that an expense was or was not "reasonably necessary," it is inappropriate to decide that issue as a matter of law. In other words, *Nasser* clearly stands for the proposition that only in rare cases will this issue be decided as a matter of law. Thus, the majority's efforts to "expound upon the phrase 'reasonably necessary'" in order to purportedly "provide essential legal guidance," are unnecessary. Rather than being "entirely consistent with" and "providing further guidance along" the lines of *Nasser*, the majority opinion borders on overruling it.

Instead of taking the majority's approach, I would adhere to precedent and leave what is generally a question of fact to the jury, where it properly belongs. In holding otherwise, the majority usurps the role of the Legislature and the jury.

"reasonably necessary." Rather than following existing precedent and holding that the determination of whether a procedure is "reasonably necessary" is one for the jury, the majority transforms this question into a question of law.

Today's decision is particularly troubling given that, as recently as December 2010, a majority of this Court clarified a Court of Appeals remand order that had stated "'[w]hether a cost constitutes an allowable expense is a question of law and so it is to be determined by the court, not the jury.'" *Wilcox v State Farm Mut Auto Ins Co*, 488 Mich 1011 (2010). This Court's clarifying order instructed that

> [a]lthough whether an expense constitutes an "allowable expense" under MCL 500.3107(1)(a) is generally a question of law for the court, *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 525-526; 697 NW2d 895 (2005), "the question whether expenses are reasonable and reasonably necessary is generally one of fact for the jury," *Nasser* [435 Mich at 55]. Therefore, to the extent that there are material questions of fact pertaining to whether the expenses in this case are reasonable and reasonably necessary, these questions of fact must be decided by a jury. [*Id*. at 1011.]

In light of this Court's recent decision in *Wilcox*, it is unclear why it is suddenly necessary to change the way that "reasonably necessary" is decided. How has this Court's precedent become so unclear in such a short time? Why must this Court now effectively reverse the instructions in *Wilcox* and disregard *Nasser*?

Finally, perhaps the most significant evidence that the majority errs is that the Legislature enacted a bill inserting language similar to that which the majority adds to the statute today, and the voters of this state rejected it by referendum. In 1993 PA 143, the Legislature amended the no-fault act, creating a standard to determine allowable expenses

14

similar to the standard that the majority has adopted today.[25]  MCL 500.3107(1), as amended by 1993 PA 143, stated:

> (1) Except as provided in subsection (3), personal protection benefits are payable for the following:
>
> (a) Allowable expenses that, for policies issued or renewed on after 120 days after the effective date of the amendatory act that added subsection (7), are as provided in subparagraphs (i) and (ii), incurred for *medically appropriate* products, services, and accommodations for an injured person's care, recovery, or rehabilitation.  For policies issued or renewed on or after 120 days after the effective date of the amendatory act that added subsection (7) and on forms approved by the commissioner, an insurer shall offer the following coverages and an insured shall select in writing 1 of the following coverages:
>
> (i) Coverage for allowable expenses consisting of all reasonable charges incurred up to a maximum of $1,000,000.00 for *medically appropriate* products, services, and accommodations for an injured person's care, recovery, or rehabilitation . . . .
>
> (ii) Coverage for allowable expenses consisting of all reasonable charges incurred up to $2,000,000.00, $3,000,000.00, $4,000,000.00, or $5,000,000.00 maximums as selected by the insured, and the insurer may offer additional coverage limits, for *medically appropriate* products, services, and accommodations for an injured person's care, recovery, or rehabilitation . . . .  [Emphasis added.]

Additionally, MCL 500.3107(4), as added by 1993 PA 143, stated in pertinent part:

> As used in this section:
>
> (a) *Medically appropriate products, services, and accommodations* rendered or prescribed by a health care facility or health care provider *are*

---

[25] The Legislature enacted 1993 PA 143, and Governor John Engler signed it into law on August 6, 1993.  The bill was set to go into effect on April 1, 1994.  Before April 1, however, a petition for referendum was filed containing the required number of valid signatures to place the referendum on the ballot.  When the petition was filed, 1993 PA 143 was suspended for the referendum vote.  *Farm Bureau Mut Ins Co of Mich v Ins Comm'r*, 204 Mich App 361; 514 NW2d 547 (1994).

15

*those that are medically necessary . . . . Under no circumstances shall an insurer be required to provide coverage for any product, service, or accommodation that is not medically appropriate and medically necessary for an injured person's care, recovery, or rehabilitation* and reasonably likely to provide continued effectiveness with respect to the injured person's care, recovery, or rehabilitation. . . . Each insurer shall designate a person with whom providers can discuss insurer determinations of what is medically appropriate and medically necessary. *Disputes over reasonable charges and medically appropriate and medically necessary products, services, and accommodations shall be a question of law to be decided by the court.*

\* \* \*

(c) Expenses within personal protection insurance coverage *shall not include experimental treatment or participation in research projects.* [Emphasis added.]

In November 1994, Proposal C asked the voters of this state to consider whether the amended requirements imposed by 1993 PA 143 embodied what the law of this state ought to be. In the referendum, Michigan voters overwhelmingly answered "No."[26] Thus, the citizens of Michigan expressly rejected a "medically necessary or medically appropriate" standard, a requirement that disputes be decided by courts as a question of law, and, most significantly, a prohibition against coverage for "experimental treatment or participation in research projects."[27]

---

[26] 60.85 percent voted to reject the enactment of 1993 PA 143. 39.15 percent voted to accept the enactment. See Michigan Manual 1995-1996, p 955.

[27] Proposal C was not the first time the voters rejected attempts by the Legislature to change the mandates of the no-fault act. In November 1992, the Legislature placed a proposal on the ballot, by initiative petition, that would, among other changes to the no-fault act, have placed certain caps on no-fault benefits. Proposal D of 1992 was also soundly rejected, with 62.6 percent of voters voting against the initiative and 37.4 percent of voters voting for the initiative. See Michigan Manual 1993-1994, p 878. Because the

16

Despite the voters' rejections of these three elements, today's decision inserts them into the no-fault act. The majority argues that, because 1993 PA 143 attempted to broadly reform the no-fault system with numerous changes to MCL 500.3107, it is somehow unclear whether the voters actually rejected the specific reforms that the majority judicially enacts today.[28] This reasoning is misguided and illogical.

First, it is improper for this Court to insert elements of a rejected law into a statute because such action amounts to judicial engineering of a statute. The voters spoke on 1993 PA 143 in Proposal C, the Legislature has not chosen to subsequently add these three rejected elements into the no-fault act, and it is wrong for the majority to do so today. Most importantly, Const 1963, art 2, § 9 states that "[n]o law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election."

Second, it is disingenuous to argue that there is no way to determine which specific element of the law the voters rejected. The voters rejected the entire law. Plain and simple, the voters said "No." Thus, it borders on nonsensical for this Court to argue that the voters only disagreed with specific elements of the act and that we do not know

---

voters have said "No" to the only two attempts by the Legislature to reform the no-fault act, it is clear that the majority of voters want the no-fault act the way it is, without changes.

[28] The majority attempts to bolster this argument by citing the Court of Appeals' opinion in *Michigan Chiropractic Council v Office of Fin &Ins Servs Comm'r*, 262 Mich App 228; 685 NW2d 428 (2004), vacated 475 Mich 363 (2006). However, this Court vacated that opinion for lack of justiciability, meaning that the issues in the case were improperly before the Court. Accordingly, I do not find the majority's citation persuasive.

17

which elements.  A referendum vote, such as that taken on Proposal C, is an all-or-nothing vote, and, with respect to what voters wanted added to the no-fault act, the voters chose *nothing*.[29]

Moreover, the majority fails to recognize the unique importance of referenda.  As Justice RILEY stated in *In re Executive Message from the Governor*, 444 Mich 1214 (1994):

> In the State of Michigan, "[a]ll political power is inherent in the people.  Government is instituted for their equal benefit, security and protection."  Const 1963, art 1, § 1.  In accordance with this fundamental maxim of republican government, "[t]he people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum."  Const 1963, art 2, § 9.  Such power is necessary to check the legislative branch of government when it either abuses its power or fails to heed the wishes of its constituency.  See, e.g., *Kuhn* v *Dep't of Treasury*, 384 Mich 378, 385 [183 NW2d 796] (1971).  The importance of the referendum is so vital that "[n]o law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election."  Const 1963, art 2, § 9.

Thus, the majority's decision today is in direct conflict with the will of the voters of this state.

_____

[29] The majority mischaracterizes my opinion, claiming that I believe that "Michigan voters intended its courts to rubber-stamp all determinations under the no-fault act . . . ." *Ante* at 30-31.  This is a gross overstatement of my much narrower point.  The point of my argument is that the voters' rejection of 1993 PA 143, which contained essentially the *same* standard that the majority adopts today, indicates both that the voters did not want to adopt a "medically appropriate" standard and that, by inference, "reasonably necessary" is a lower standard than "medically appropriate."

The pertinent part of the statute only uses the phrase "reasonably necessary" and specifies that the procedure must be for the "injured person's care, recovery, or rehabilitation." As noted earlier, if there is any factual dispute about whether a treatment is "reasonably necessary," that dispute must properly be decided by a jury. Rather than focusing on one factor, such as objective and verifiable medical evidence establishing the efficacy of the procedure, a determination by the jury could include an analysis of any number of factors. Such factors could include medical professionals' conclusions regarding the reasonable necessity of a procedure, lay persons' conclusions regarding the reasonable necessity of a procedure, scientific support for the effectiveness of a procedure, or possibly even the subjective belief of the plaintiff. The point, however, is that it is up to the jury, on a case-by-case basis, to decide what is reasonable or unreasonable. Michigan's Constitution affords parties "[t]he right of trial by jury . . . ."[30] This Court should not disregard the important fact-finding role of the jury. This Court must respect the no-fault act as it is currently written.

CONCLUSION

Today's decision rewrites the requirements for an insurer to pay allowable expenses under MCL 500.3107 of Michigan's no-fault act. The majority holds that the procedure in this case was not "reasonably necessary" and, in doing so, adds language to the no-fault act that was rejected by referendum in 1994. The majority reaches its result by erroneously removing the determination of which expenses are "reasonably

---

[30] Const 1963, art 1, § 14.

necessary" from the jury. Additionally, the majority's new judicially crafted definition of "reasonably necessary" elevates the standard for proving that treatment is "reasonably necessary" to one that is more stringent than MCL 500.3107(1)(a) requires. I would apply the no-fault act as written, I would uphold the jury's finding in this case that the procedure performed on plaintiff was "reasonably necessary," and I would hold that plaintiff is entitled to reimbursement of the costs associated with the procedure. Accordingly, I dissent.

<div style="margin-left: 55%;">
Diane M. Hathaway<br>
Michael F. Cavanagh (except<br>
  footnote 20)<br>
Marilyn Kelly
</div>