*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FALMOUTH COOPERATIVE COMPANY,

        Plaintiff/Counterdefendant-Appellee,

v

PETER BONTEKOE, doing business as
BONTEKOE FARMS,

        Defendant/Counterplaintiff-Appellant,

and

PAM BONTEKOE, doing business as BONTEKOE
FARMS, DOUG BONTEKOE, doing business as
BONTEKOE FARMS, and AMY BONTEKOE,
doing business as BONTEKOE FARMS,

        Defendants/Counterplaintiffs.

UNPUBLISHED
October 15, 2020

No. 348568
Osceola Circuit Court
LC No. 16-014810-CZ

Before: MURRAY, C.J., and CAVANAGH and CAMERON, JJ.

PER CURIAM.

In this action concerning allegedly defective cattle feed, defendant-counterplaintiff Peter Bontekoe ("Peter"), doing business as Bontekoe Farms, appeals as of right[1] the trial court's

---

[1] Peter filed his claim of appeal from a *stipulated* order of dismissal with prejudice. Plaintiff-counterdefendant, Falmouth Cooperative Company, argues that this Court lacks jurisdiction because Peter, having stipulated to the dismissal of this action, does not qualify as an "aggrieved party" for purposes of MCR 7.203(A). Although Peter may not be "aggrieved" as a result of the *final* order from which he now appeals, he was aggrieved by the trial court's earlier order granting summary disposition of his counterclaims to Falmouth Cooperative Company, and thus he

-1-

stipulated order of dismissal with prejudice. The other defendants-counterplaintiffs—Pam Bontekoe ("Pam"), Doug Bontekoe ("Doug"), and Amy Bontekoe ("Amy"), all of whom also do business as Bontekoe Farms—were dismissed without prejudice below and are not parties to this appeal.[2] We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the parties' dispute concerning livestock feed that the Bontekoes purchased from Falmouth Cooperative Company (FCC) and fed to their dairy cows at Bontekoe Farms in 2013 and 2014. FCC initiated this action against the Bontekoes in October 2016, filing a one-count complaint asserting an account-stated claim for the Bontekoes' alleged failure to pay for the disputed feed. After answering FCC's complaint, the Bontekoes filed a counterclaim, which they subsequently amended. In the amended counterclaim—which was filed after Pam, Doug, and Amy were dismissed as parties—Peter alleged that the feed provided by FCC "was defective, lacked necessary and/or appropriate nutrient levels and was toxic" to the Bontekoes' "close up" cows (i.e., "impregnated adult female cow[s] . . . in the final 21 days of pregnancy"), which resulted in those cows developing "milk fever" (also known as hypocalcemia). Peter alleged that as a result of consuming FCC's feed, "many" of his cows died, suffered miscarriages or stillbirths, produced less milk, required veterinary treatment, and were sold as "damaged stock" at "bargain basement" prices. The amended counterclaim asserted five counts against FCC: (1) products liability; (2) violation of the "obligation of good faith" under MCL 440.1304, which is part of the Michigan Uniform Commercial Code (UCC), MCL 440.1101 *et seq.*; (3) violation of the "implied warranty of merchantability" under the UCC; (4) violation of express warranties under the UCC; and (5) violation of the "implied warranty of fitness for particular purpose" under the UCC.

Following a contentious period of discovery, FCC filed the two motions that are of primary importance here. First, it filed a motion in limine to exclude any expert testimony or conclusions by Peter's son, Doug, "on the issues of: (1) diagnosis of hypocalcemia in . . . cattle; (2) the cattle feed that [FCC] sold to Peter Bontekoe allegedly causing the alleged hypocalcemia; (3) damages . . . allegedly sustained and projections; and (4) any other matter that calls for expert witness testimony[.]" FCC argued that Doug was not qualified to offer expert opinions in those regards, and that his opinions concerning hypocalcemia were not sufficiently reliable to be admissible under MRE 702 and MCL 600.2955(1).

The second motion of import is FCC's motion for summary disposition of Peter's counterclaims under MCR 2.116(C)(10). FCC argued that the proposed expert opinions regarding causation of Peter's two expert witnesses—Dr. Herb Bucholtz and Steve Adsmond—were not sufficiently reliable to warrant admission under MRE 702 and MCL 600.2955(1). In the absence of such expert testimony, FCC argued, Peter had failed to present sufficient substantively admissible evidence to allow a rational trier of fact to conclude that the hypocalcemia suffered by

---

qualifies as an "aggrieved party" under MCR 7.203(A). See *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291-292; 715 NW2d 846 (2006).

[2] Collectively, we will refer to defendants-counterplaintiffs as "the Bontekoes."

the Bontekoes' dairy herd during the pertinent timeframe was caused by FCC's feed. FCC also argued that even assuming, arguendo, that the expert testimony of Dr. Bucholtz and Adsmond concerning causation *was* admissible, it was insufficient to create a genuine issue of material fact regarding causation because even with such evidence, a rational juror could not conclude that the disputed feed—rather than one of the many other potential causes of hypocalcemia in dairy cows—more likely than not caused the hypocalcemia.

Without seeking leave of the trial court to exceed the 20-page limit set forth by MCR 2.119(2)(a), Peter filed a 47-page, largely single-spaced response opposing FCC's motion for summary disposition. He argued that Adsmond and Dr. Bucholtz were qualified to offer expert testimony with regard to whether FCC's feed caused Bontekoe Farms's close-up cows to develop hypocalcemia during the disputed timeframe. In any event, Peter argued, even if the trial court disagreed concerning Adsmond and Dr. Bucholtz, the testimony of veterinarian Dr. Jeffrey Erdman was, standing alone, sufficient to yield a genuine issue of material fact for trial regarding causation. Peter also argued that he was entitled to summary disposition concerning the counterclaims under MCR 2.116(I)(2). Although Peter quoted extensively from what he represented to be the deposition transcripts of several witnesses (including Adsmond, Dr. Bucholtz, and Dr. Erdman), he did not append copies or excerpts of the certified transcripts from the depositions of such witnesses. Rather, with regard to Dr. Bucholtz only, Peter appended a typewritten list of quotations—which is not in the form of a certified transcript—purportedly drawn from Dr. Bucholtz's deposition transcript. Otherwise, Peter did not include any transcript excerpts in support of his response brief.

The trial court granted FCC summary disposition of the counterclaims against it, reasoning that neither Adsmond nor Dr. Bucholtz were sufficiently qualified as experts under MRE 702 to testify as to causation. And, the court concluded, although Dr. Erdman was qualified as an expert, his testimony could not sufficiently identify a cause of milk fever in the farm's dairy herd. Absent this critical evidence, the court ruled that Peter could not create a genuine issue of material fact, and dismissal was required. Thereafter, FCC's claims against Peter remained pending, and so the action below continued. Ultimately, the parties stipulated to the entry of a final order dismissing all remaining claims, after which Peter claimed his instant appeal.

## II. ANALYSIS

Peter argues that the trial court abused its discretion by holding that the proposed expert testimony of Doug, Dr. Bucholtz, and Adsmond with regard to causation was too unreliable to merit admission under MRE 702 and MCL 600.2955(1). Peter also argues that the trial court erred by granting FCC summary disposition of Peter's counterclaims.

We review for an abuse of discretion a trial court's decision whether to exclude expert evidence for lack of reliability. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes," and "[t]he admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion." *Id.* (quotation marks and citation omitted). "We review de novo questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules." *Id.*

A trial court's ruling regarding a motion for summary disposition is also reviewed de novo. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

"Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).

The moving party bears the initial burden of production, which may be satisfied "in one of two ways." *Quinto v Cross & Peters Co*, 451 Mich 358, 361; 547 NW2d 314 (1996). "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 362 (quotation marks and citation omitted). Once the moving party satisfies its burden in one of those two ways, "[t]he burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id.*

Preliminarily, we note that Peter's appellate appendix contains materials that are not properly considered in reviewing the trial court's ruling on the motion for summary disposition. Under MCR 2.116(G)(6), "[a]ffidavits, depositions . . . and documentary evidence offered in support of or in opposition to a motion based on subrule (C)(1) - (7) or (10) shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion." See also *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999) ("The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the *substantively admissible* evidence actually proffered[.]") (emphasis added). In addition, "this Court's review is limited to review of the evidence properly presented to the trial court." *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 380; 775 NW2d 618 (2009).

Peter's appellate appendix includes excerpts from certified deposition transcripts of himself, Doug, Dr. Erdman, Adsmond, and Dr. Bucholtz. Although Peter purportedly quoted portions of these transcripts in his response to FCC's motion for summary disposition of the counterclaims—which was, aside from its 47-page length and failure to double space, the only *proper* response that Peter filed, see MCR 2.116(G)(1) and MCR 2.119(A)(2)(a)—he did not append copies of those transcripts or excerpts of them to his initial response. Nor did he append such copies to his subsequent "amended" response or his response to FCC's reply brief regarding

summary disposition. Because Peter did not properly present those transcripts to the trial court before its decision, we can only properly consider them here to the extent that portions of them *were* presented to the trial court as appendices to FCC's motion for summary disposition. See *Barnard Mfg Co*, 285 Mich App at 380-381.

Turning to the substantive merits, we are unpersuaded by Peter's instant claims of error. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Additionally, MCL 600.2955 provides, in relevant part:

> (1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:
>
> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.
>
> (b) Whether the opinion and its basis have been subjected to peer review publication.
>
> (c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.
>
> (d) The known or potential error rate of the opinion and its basis.
>
> (e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.
>
> (f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.
>
> (g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field.

As a general rule, "there is no requirement that an expert's qualifications and methods be incorporated into an affidavit submitted in support of, or opposition to, a motion for summary disposition. Rather, the *content* of the affidavits must be admissible in *substance*, not form." *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). However, as the trial court noted, trial courts have a "gatekeeping obligation" under MRE 702, which obliges them "to review *all* expert opinion testimony" for admissibility under that rule. *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). "This gatekeeper role applies to *all* stages of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "Careful vetting of all aspects of expert testimony is especially important when an expert provides testimony about causation." *Id*. "While a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention, the court *must* evaluate expert testimony under MRE 702 once that issue is raised." *Craig*, 471 Mich at 82.

Moreover, a party need not wait until trial to raise such a challenge; rather, the issue is properly raised at summary disposition. See, e.g., *Elher*, 499 Mich at 14 (affirming a trial court's grant of summary disposition to a defendant doctor because the opinion testimony of the plaintiff's proposed expert would have been inadmissible at trial under MRE 702), and *Amorello v Monsanto Corp*, 186 Mich App 324, 331-332; 463 NW2d 487 (1990) (holding that a party relying on expert opinion testimony to survive summary disposition bears the burden of demonstrating that such testimony will be admissible at trial, under MRE 702, before it can be properly considered for purposes of summary disposition).

"Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010). "[T]he whole point of *Daubert*[3] is that experts can't speculate. They need analytically sound bases for their opinions, and it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Id*. at 642 n 6 (quotation marks, citations, and brackets omitted). "[W]hile not dispositive, a lack of supporting literature is an important factor in determining the admissibility of expert witness testimony." *Id*. at 640. Thus, a trial court should consider peer-reviewed literature that is cited by the parties as part of entertaining a *Daubert* challenge. *Elher*, 499 Mich at 28. Scholarly publications, peer-reviewed studies, and administrative-agency publications are all examples of the sort of "objective and verifiable evidence" that can be used to support the reliability of an expert's proffered opinion. *Krohn v Home-Owners Ins Co*, 490 Mich 145, 178; 802 NW2d 281 (2011).

Peter first argues that the trial court abused its discretion by granting FCC's motion to preclude Doug from offering any expert opinions at trial concerning what caused the hypocalcemia

---

[3] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 589; 113 S Ct 2786; 125 L Ed2d 469 (1993).

suffered by the dairy herd at Bontekoe Farms during the disputed timeframe. Peter's trial counsel waived any such claim of error below, however, by affirmatively indicating to the trial court—both in writing and at the pertinent motion hearing—that Peter intended to call Doug as an expert with regard to damages *only*, not to offer any expert opinions concerning "a specific medical diagnosis," or what caused Bontekoe Farms's dairy herd to develop hypocalcemia. It is axiomatic "that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *Cassidy v Cassidy*, 318 Mich App 463, 476; 899 NW2d 65 (2017) (quotation marks and citation omitted). "A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Living Alternatives for Developmentally Disabled, Inc v Dep't of Mental Health*, 207 Mich App 482, 484; 525 NW2d 466 (1994). Therefore, we deem Peter's instant claim of error to have been waived in the trial court. See, e.g., *Grant v AAA Michigan/Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148-149; 724 NW2d 498 (2006) (holding that the plaintiff's trial counsel had waived a particular appellate argument by asserting a contrary position in the trial court). Any other result would be inconsistent with the principle that parties may not "harbor error as an appellate parachute." See *Bates Assoc, LLC v 132 Assoc, LLC*, 290 Mich App 52, 64; 799 NW2d 177 (2010).

Peter also argues that the trial court abused its discretion by deciding that Adsmond's proposed expert opinion regarding causation—i.e., that the hypocalcemia at Bontekoe Farms was caused by FCC's failure to formulate the disputed animal feed to the nutritional specifications recommended by its competitor, Prince Agriproducts, Inc.—was too unreliable to be admissible under MRE 702 and MCL 600.2955(1).

However, as the trial court recognized, although Adsmond is admittedly neither "a veterinarian" nor "a medical expert," his experience as an "animal nutritionist" and his education, which includes a bachelor's degree "in animal science," with a concentration in "bovine" animals, are sufficient to qualify him as an expert with regard to bovine nutrition. Thus, we perceive no abuse of discretion in the trial court's conclusion that Adsmond was qualified to offer expert testimony about potential causes of hypocalcemia from a purely theoretical standpoint.

Nor do we perceive any abuse of discretion in the trial court's conclusion that Adsmond was not qualified to offer such expert testimony with regard to what most likely caused the hypocalcemia. Adsmond admitted that because he never personally visited Bontekoe Farms or viewed any photographs or videos of it, he was unfamiliar with the premises, the barns in which the dairy herd are housed, and how the farm "blends its silage" and "stores its animal feed[.]" He also admitted that he had not reviewed any of Bontekoe Farms's veterinary records or any "necropsy report" concerning its affected cattle; that he did not know how old Bontekoe Farms's affected cattle were during the disputed timeframe, what stresses they had been under, what their rate of milk production had been, or how many "calving cycles" they had been through; that such factors are relevant in determining a given cow's risk of developing hypocalcemia; and that he could not "produce any scientific, peer reviewed studies" supporting his opinion regarding causation. In light of these admissions, Adsmond's opinion was not sufficiently reliable to warrant admission under MRE 702 and MCL 600.2955(1). Given his lack of knowledge concerning the specific details of the hypocalcemia problem at Bontekoe Farms during the pertinent timeframe, his proposed expert opinion rests upon a foundation of conjecture and speculation, not informed expert judgment. Thus, the trial court did not abuse its discretion with regard to Adsmond's

proposed expert opinion. See *Gilbert*, 470 Mich at 783 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (quotation marks and citation omitted).

For similar reasons, we reject Peter's argument that the trial court abused its discretion by deciding that Dr. Bucholtz's proposed expert opinion regarding causation—i.e., that the hypocalcemia at Bontekoe Farms was caused by FCC's failure to include sufficient Dietary Anion Cation Difference (DCAD) supplementation in the disputed animal feed—was too unreliable to be admissible under MRE 702 and MCL 600.2955(1). As with Adsmond, Dr. Bucholtz admitted that he did not visit Bontekoe Farms during the disputed timeframe. Adsmond first visited it in 2018, and he was not aware whether any changes had been made to the "close-up cow barn" in the intervening period before his visit. He also admitted that he was not aware of what the cattle at Bontekoe Farms "actually . . . ate" during the disputed timeframe; that because only 22 of Bontekoe Farms's dairy cows received blood tests during the disputed timeframe, his opinion concerning the actual rate of hypocalcemia in the herd that winter (i.e., that 52 of Bontekoe Farms's cows had suffered hypocalcemia during that period) was based on Doug's assertions concerning the number of cows that he had diagnosed as having hypocalcemia; that it was possible for dairy cattle to develop hypocalcemia as a result of conditions "having nothing to do with cattle nutrition"; that he could not "rule out" such potential "contributing factors" in this case, including "frozen feed, insufficient water, . . . frozen bedding, age, lactation cycles, milk production levels, food storage without moisture protection, mycotoxins, and mold"; that the "gold standard" nutritional guidelines established by the National Research Council (NRC) are what those in the dairy industry generally "rely on," and the NRC guidelines, which were last updated in 2001, mention DCAD, but do not include any "requirement for DCAD"; and that the scientific "theories" concerning what feed formulation best prevents hypocalcemia have changed "[m]any times over the years[.]"

Consequently, Dr. Bucholtz's causation opinion regarding DCAD was not sufficiently reliable to warrant admission under MRE 702 and MCL 600.2955(1). As with Adsmond, given Dr. Bucholtz's admitted lack of knowledge concerning the specific details of the hypocalcemia problem at Bontekoe Farms during the pertinent timeframe, his proposed expert opinion is founded on conjecture and speculation, not informed expert judgment. Accordingly, we cannot conclude that the trial court abused its discretion with regard to Dr. Bucholtz's proposed expert opinion. *Elher*, 499 Mich at 21.

Having found no abuse of discretion in the trial court's ruling concerning the proposed expert testimony of Doug, Adsmond, and Dr. Bucholtz, we further conclude that the trial court did not err by granting FCC summary disposition of Peter's counterclaims under MCR 2.116(C)(10). "Michigan law does not permit us to infer causation simply because a tragedy occurred in the vicinity of a defective product." *Skinner v Square D Co*, 445 Mich 153, 174; 516 NW2d 475 (1994). Rather, to avoid summary disposition with regard to the element of causation, a plaintiff must "set forth specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Id*. The plaintiff cannot merely "posit[] a causation theory premised on mere conjecture and possibilities." *Id*. It is true that "motions for summary judgment implicate considerations of the jury's role to decide questions of material fact. At the same time, however, litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Id*.

In this instance, Dr. Erdman acknowledged that, in his expert opinion, it was not possible to isolate any single cause of the hypocalcemia problems that Bontekoe Farms suffered during the disputed timeframe.[4] On the contrary, he testified several times that there were most likely several contributing causes, including the unusually harsh weather conditions[5], decreased water consumption, and nutrition in general. Moreover, given the limited blood testing that was conducted, there is a dearth of evidence concerning the actual extent of the problem, i.e., the number of cows actually affected. There is also a dearth of evidence concerning the nutritional characteristics of the forage material that the Bontekoe Farms herd ate during the winter in question, although there *is* evidence that such forage, rather than FCC feed, constituted the lion's share of their diet. There is also evidence that the feed may have been exposed to moisture, snow or ice, and may have been fed in less-than-ideal circumstances. On the other hand, there is no substantively admissible evidence concerning several factors that the proposed experts agreed were relevant in determining a given cow's risk of developing hypocalcemia: the age of the affected cows, how many calves each had birthed, their breed, and their relative rate of milk production.

In the absence of any expert testimony to establish a causal nexus between the disputed livestock feed and the documented cases of hypocalcemia at Bontekoe Farms, a trier of fact would be left with nothing to establish a causal nexus except the temporal relationship between the feed's introduction and the ensuing cases of hypocalcemia. Tacitly recognizing this, Peter argues that, viewing the evidence in the light most favorable to him as the nonmoving party, such a temporal relationship is sufficient to yield a genuine issue of material fact regarding causation. However, "[r]elying merely on a temporal relationship is a form of engaging in the logical fallacy of *post hoc ergo propter hoc* (after this, therefore in consequence of this) reasoning." *West v Gen Motors Corp*, 469 Mich 177, 186 n 12; 665 NW2d 468 (2003) (quotation marks and citation omitted). Standing alone, such speculative temporal evidence is insufficient, as a matter of law, to yield a genuine issue of material fact concerning causation. See *Lowery v Enbridge Energy Ltd Partnership*, 500 Mich 1034, 1034; 898 NW2d 906 (2017) (holding that an expert's opinion concerning causation, which was that an oil spill must have caused the plaintiff's damages because he "wasn't having the problems before [the oil spill] and he was having the problems afterwards," was insufficient to create "a genuine dispute of material fact as to causation.") (alteration in original). Similarly, the temporal relationship between the disputed feed and the alleged hypocalcemia is insufficient for Peter to survive summary disposition with regard to causation.

Finally, we are also unpersuaded by Peter's argument that the trial court erred by concluding that the failure of his proofs regarding causation was fatal to *all* of his counterclaims,

---

[4] For this reason, *Mulholland v DEC Int'l Corp*, 432 Mich 395; 443 NW2d 340 (1989), does not help Peter's cause. Dr. Erdman's testimony centered on the notion that there are several causes of hypocalcemia and even more factors that can exacerbate and/or accelerate hypocalcemia in dairy cattle. His testimony crystallized that there are many factors in both causing hypocalcemia and the extent to which it affects a dairy herd, with no one factor (and particularly not the feed) leaping out as more probably the cause of this hypocalcemia. *Mulholland,* 432 Mich at 416, n 18.

[5] Dr. Erdman testified that although nutrition was *a* cause of hypocalcemia, it was not a primary factor, and the harsh 2013-2014 winter played a "huge" part in the hypocalcemia experienced.

including his UCC-warranty claims. In the prayer for relief in Peter's counterclaim, the only specific remedy he requested was an award of damages. "A plaintiff asserting a cause of action has the burden of proving damages with reasonable certainty, and damages predicated on speculation and conjecture are not recoverable." *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 96; 706 NW2d 843 (2005). In other words, it is an essential element of any claim seeking legal damages that the defendant's disputed act or omission had some sort of causal relationship to the plaintiff's resulting damages. If the relationship is predicated on mere speculation or conjecture, the requested damages are not recoverable.

As this Court recognized in *Leavitt v Monaco Coach Corp*, 241 Mich App 288, 298; 616 NW2d 175 (2000), the UCC expressly enumerates the damages that may be awarded for a breach-of-warranty claim pursued under that act. Specifically, MCL 440.2714 provides:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of section 2607)[6] he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

Thus, Peter's failure to demonstrate that a genuine issue of material fact existed concerning causation is fatal to all of his counterclaims, including those pursued under the UCC. Absent evidence that the feed supplied by FCC was actually so deficient in nutrients that it affirmatively caused the hypocalcemia problems at Bontekoe Farms, or that it was therefore worth less than it would have been if delivered as warranted, a rational trier of fact could only speculate as to what damages might be appropriately awarded under MCL 440.2714.

---

[6] In relevant part, the referenced subsection provides:

> (3) Where a tender has been accepted
>
> (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.] [MCL 440.2607(3).]

Affirmed.

/s/ Christopher M. Murray
/s/ Mark J. Cavanagh
/s/ Thomas C. Cameron