*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHIGAN ELECTRIC TRANSMISSION
COMPANY, LLC,

        Plaintiff/Counterdefendant-Appellee,

v

MICHIGAN PUBLIC POWER AGENCY,

        Defendant/Counterplaintiff-Appellant.

FOR PUBLICATION
June 23, 2025
12:20 PM

No. 368921
Ingham Circuit Court
LC No. 23-000539-CB

Before: GARRETT, P.J., and RICK and FEENEY, JJ.

RICK, J.

Defendant/counterplaintiff, Michigan Public Power Agency (defendant), appeals as of right an order granting summary disposition in favor of plaintiff/counterdefendant, Michigan Electric Transmission Company, LLC (plaintiff) under MCR 2.116(C)(10) (no genuine issue of material fact). We affirm.

## I. BACKGROUND

### A. LEGAL AND FACTUAL CONTEXT

This case presents a matter of first impression involving the transmission infrastructure planning act, MCL 460.591 *et seq.*, recently enacted by 2021 PA 125 and made effective on December 17, 2021.[1] Plaintiff and defendant are transmission companies operating in Michigan. At issue in this case are two new transmission-line projects that are set to be constructed in lower Michigan as part of a regional grid improvement.

Act 125 gives incumbent electric transmission line owners, like these parties, rights of first refusal over future regionally cost-shared transmission projects. However, Act 125 requires that

---

[1] The parties and trial court consistently refer to the statute as a whole as Act 125. For consistency, we will do the same.

such projects interconnect to the owner's existing facilities and be included as part of a plan approved by a recognized planning authority. See MCL 460.593. This case primarily presents a narrow but important question: whether defendant's electric transmission line interconnects with a regionally cost-shared transmission line, which would grant defendant the right to engage with plaintiff as a co-owner of that regionally cost-shared transmission line.

MCL 460.593(1) provides:

> (1) An incumbent electric transmission company has the right to construct, own, operate, maintain, and control a regionally cost-shared transmission line if both of the following apply:
>
> (a) The regionally cost-shared transmission line or its construction was included in a plan adopted or otherwise approved by a recognized electric planning authority for the incumbent electric transmission company.
>
> (b) The regionally cost-shared transmission line will interconnect to facilities owned, or that will be owned, by that incumbent electric transmission company.

There is no dispute that plaintiff is an "incumbent electric transmission company" within the meaning of the statute. With regard to MCL 460.593(1)(a), litigated in the trial court, the parties disputed whether defendant had authority to create or approve a plan for a cost-shared transmission line. The trial court ruled that this condition was met because plaintiff and defendant were both members of the Midcontinent Independent System Operator (MISO), which is the recognized electric planning authority for the transmission lines at issue here. The parties do not dispute that ruling on appeal. Thus, the only requirement at issue in this appeal concerns MCL 460.593(1)(b), which directs that regionally cost-shared transmission lines at issue in the present case must interconnect to defendant's facilities. The heart of this dispute concerns the meaning of the word "interconnect."

In general, the historical and legal background for this case is not in question. MISO oversees and operates transmission systems across 14 states, including large portions of Michigan and Canada. As earlier noted, incumbent transmission owners have a right of first refusal for new transmission infrastructure, meaning they have the first choice of whether to build such infrastructure. This right of first refusal was previously granted by the Federal Energy Regulatory Commission (FERC), which regulates interstate electricity transmission. In 2011, the FERC ended the federal right of first refusal and left it up to individual states to determine whether they wanted to continue using the right of first refusal or, in the alternative, transfer to a competitive bidding system. After transmission-line development stalled, Michigan adopted a state right of first refusal by passing Act 125. This right of first refusal can be jointly exercised by multiple incumbents if they own the same facilities. See MCL 460.593(2).

Plaintiff is an independent transmission company. It owns and operates a high-voltage transmission system consisting of approximately 5,600 circuit miles of transmission lines in the northern and western Lower Peninsula. MISO provides transmission services via plaintiff's facilities pursuant to an open-access transmission, energy, and operating reserves tariff.

Defendant, on the other hand, is a not-for-profit agency created under the Michigan energy employment act of 1976, MCL 460.801 *et seq*. It acts on its own behalf and on behalf of municipal electric systems who are members of the agency.

This case involves two new transmission projects approved by MISO: the Hiple-Duck Lake and Oneida Nelson Road Projects (collectively, "the Projects").[2] The Projects were initiated by MISO in 2020 as part of the Long-Range Transmission Plan (LRTP) initiative. MISO approved 18 new projects as part of the initiative, including the Projects at issue in this case.

The Hiple-Duck Lake Project includes a transmission line beginning at Hiple Substation, which is located in Indiana. The transmission line will run north and connect to a new substation located at Duck Lake in lower Michigan.[3] According to information available in the record, the Hiple Substation is owned by a nonparty company in Indiana, but the new Duck Lake Substation will be owned by plaintiff. In addition to the new substation, plaintiff will also upgrade three transmission line segments, which will interconnect to the substation. The Oneida-Nelson Road Project includes a transmission line beginning in Eaton County, Michigan, at the existing Oneida Substation. The transmission line will run north to Gratiot County, Michigan, where it will connect to the existing Nelson Road Substation. The Oneida Substation and Nelson Road Substations are owned by plaintiff.

Defendant has a 90% ownership interest in transmission lines located between the Projects, which are known as the Oneida Lines. Plaintiff owns the other 10% of these lines. There is no dispute that the Projects constitute a "regionally cost-shared transmission line," as defined under MCL 460.592(k), for purposes of MCL 460.593(1)(b). In the trial court and on appeal, defendant provided satellite maps of the Projects, plaintiff's lines and substations, and defendant's Oneida Lines. **Map 1** presents a "zoomed out" overview of both of the Projects:

---

[2] In the trial court, defendant referred to the first project as the "Hiple-Duck Lake Project," but plaintiff referred to it as the "Helix-Hiple Project." Defendant referred to the second project as the "Oneida-Nelson Road Project," but plaintiff referred to it as the "Nelson Road-Oneida Project." The trial court appeared to accept defendant's naming convention; thus, for consistency, we will do the same.

[3] Plaintiff refers to this new substation as the "Helix substation," but defendant and the trial court referred to it as the Duck Lake substation. Once again, we will follow the lead of defendant and the trial court.



The red lines represent the new transmissions lines that will be constructed as part of the Projects. The blue line represents defendant's Oneida Lines, and the orange lines represents other transmission lines owned by plaintiff. The blue and red markers represent the substations previously described.

Map 2 presents a "zoomed in" view of the Hiple-Duck Lake Project:



The coloring of the lines mirror those of the first map: red represents the new transmission lines that will be constructed. The blue represents defendant's lines, and the orange represents plaintiff's lines. The red marker indicates the new Duck Lake Substation.[4]

Defendant claims that its Oneida Lines, i.e., the blue lines, will interconnect with the Projects, i.e., with the red lines or substations shown in the maps above. But in the trial court, Charles L. Marshall, an employee of plaintiff, averred that the Hiple-Duck Lake Project does *not* interconnect with defendant's facilities. Marshall also stated that the Oneida-Nelson Road Project interconnects with plaintiff's Oneida and Nelson Road substations, but not to defendant's facilities.

---

[4] In a footnote to its reply brief, defendant disputes the location of the new Duck Lake Substation marker, reasoning that it does not comply with the coordinates stated in the LRTP. This dispute was not addressed in defendant's brief on appeal and is thus waived. See *Bronson Methodist Hosp v Mich Assigned Claims Facility*, 298 Mich App 192, 199; 826 NW2d 197 (2012). Moreover, defendant put forward this map, relied on it, and never challenged the substation's location. Defendant cannot do so now on appeal. See *LeFever v Matthews*, 336 Mich App 651, 670 n 3; 971 NW2d 672 (2021) ("To allow a party to assign error on appeal to something that he or she deemed proper in the lower court would be to permit that party to harbor error as an appellate parachute.").

However, Brent Taylor, an employee of defendant, averred that MISO expected the Oneida line to interconnect with the Projects.

The LRTP included descriptions of the Projects. For the Hiple-Duck Lake Project, the following description is listed: "Construct new 8-position 345 kV breaker-and-a-half bus[5] substation. Loop in Argenta-Tompkins, Battle Creek-Oneida, and Oneida-Majestic 345 kV lines into Duck Lake." Taylor pointed to this language and averred that it meant that "eight lines should interconnect at the new Duck Lake Substation," and that the Oneida Lines would necessarily need to interconnect at the new Duck Lake Substation.

In a second affidavit, Marshall countered that MISO had "not dictated the precise location where the new transmission lines for the . . . Projects must interconnect to existing facilities." Marshall was unaware of any instance where MISO required interconnection at a particular location. According to Marshall, MISO left those decisions to the transmission owner responsible for the project. Marshall affirmed that plaintiff had decided how the Hiple-Duck Lake Project "will interconnect to [plaintiff]'s existing transmission facilities[.]" Using the previously depicted maps, Marshall further affirmed that the Oneida Lines, i.e., the blue lines, connected to plaintiff's "existing transmission facilities," i.e., the orange lines, and that neither the Oneida Lines nor any other of defendant's facilities would "touch or connect to" either the new Duck Lake Substation or its new transmission line, i.e., the red lines and red marker. In order to do so, this would require plaintiff "to cross the [Hiple-Duck Lake] Project over already existing transmission facilities . . . ."

In a second affidavit, Taylor countered that the LRTP clearly provided that the Oneida Lines would connect with the new Duck Lake Substation. Taylor reiterated his prior affirmations that the language used in the LRTP meant that eight new transmission lines must connect to the new substation and that the Oneida Lines must be part of this for the total number of lines to add up to eight. Taylor additionally affirmed that "[t]he 'Battle Creek-Oneida' and 'Oneida-Majestic' lines referenced in the LRTP *include the Oneida Line*."

For the Oneida-Nelson Road Project, the following description is listed in the LRTP: "Add 2-345kV line positions (replace existing bus with breaker-and-a-half bus)." Taylor described this as a replacement of "the existing bus with breaker-and-a-half bus" at the Oneida Substation and stated that the replacement was cost-shared. According to Taylor, defendant "interconnects to the existing bus, and will connect to the new [i.e., replacement] bus at the Oneida substation," thereby making defendant's Oneida Lines "necessarily interconnect" to this part of the Projects. Taylor affirmed that the Projects would be completed by connecting through defendant's Oneida Lines and that the LRTP expressly relied on existing infrastructure to build the Projects.

In his second affidavit, Marshall countered that (1) the Oneida Substation was 100% owned by plaintiff; (2) the Oneida-Nelson Road Project's transmission line would connect to the Oneida

_____

[5] A bus "is defined as the vertical line at which the several components of the power system like generators, loads, and feeders, etc., are connected." Circuit Globe, *Classification of Power System Buses* <https://circuitglobe.com/classification-of-power-system-buses.html> (accessed May 29, 2025).

Substation from the north; and (3) defendant's Oneida Line connected to the substation from the south. Accordingly, the Oneida-Nelson Road Project did not connect to the Oneida Lines or any of defendant's other facilities. Moreover, Marshall explained that the Oneida Lines' "end point" was "where it connects to the Oneida substation's line entrance structure on the south side of the substation." Marshall affirmed that plaintiff owned this "line entrance structure" and that defendant had no ownership interest in it. Marshall additionally stated that the Oneida Line did not connect to "any bus work" or any other of the substation's equipment, including the "replacement bus."

In his second affidavit, Taylor countered that Marshall's affirmations about the Oneida Line ending at the line entrance structure and not connecting to any of plaintiff's other equipment were unsupported. Taylor explained that

> [t]he Oneida Line would not be able to function as a component of the transmission system if it did not connect to a bus in the Oneida substation. Without connecting the Oneida Line to a bus, electricity cannot flow from the Oneida Line to other transmission lines that connect to the same bus in the Oneida substation. And because electricity does indeed flow from the Oneida Line to other transmission lines, the Oneida Line necessarily connects to a bus at the Oneida substation.

Taylor believed Marshall was baselessly asserting "that the 'entrance structure' demarcates the end of [defendant]'s 90% ownership in the Oneida Line even though the line carrying the electric current must necessarily carry through to the bus." Taylor had not seen any documentation to support Marshall's opinion and again affirmed that "the LRTP includes plans establishing that the Oneida Line will connect to the new breaker-and-a-half bus that is to be installed pursuant to the LRTP." Additionally, Taylor affirmed that "regardless of how [plaintiff] plans to avoid 'directly connecting' to the Oneida Line, [plaintiff] will still run power through the Oneida Line to transfer electricity to/from the new Duck Lake Substation to/from the Oneida Substation." This meant "the LRTP as modeled by MISO would not function as designed without connecting to the Oneida Line."

After MISO approved of the Projects via the LRTP, plaintiff took steps to begin construction. In September 2022, plaintiff filed a notice of intent to construct, own, and operate the Projects with the Michigan Public Service Commission (MPSC). Later that month, plaintiff informed defendant that, given the way the new Duck Lake Substation was configured, defendant would not be able to participate in the construction or ownership of the Projects. But on October 21, 2022, defendant filed its own notice with the MPSC, stating that, pursuant to MCL 460.593(3)(a), it intended "to participate in the construction and ownership of the Hiple-Duck Lake and Oneida-Nelson Road transmission projects in Michigan." Defendant stated that it would "work with [plaintiff] to coordinate planning, development and comply[] with the requirements of local, state, and federal governing bodies and regulatory authorities."

In January 2023, defendant submitted a report to the MPSC about its plan for constructing and jointly owning the Projects. According to Taylor, the plan indicated that defendant expected plaintiff to "take the lead on design and cost development but do so in coordination with [defendant]." But according to Marshall, defendant's actions had created uncertainty for plaintiff in continuing the construction of the Projects, which it expected to construct, own, and operate,

without co-ownership with defendant. Any hope of cooperation between the parties thereafter broke down.

## B. PROCEDURAL HISTORY

In August 2023, Plaintiff filed a two-count complaint for declaratory relief (Count I) and injunctive relief (Count II). Only the declaratory relief is at issue in this appeal. Pointing to Marshall's first affidavit, plaintiff alleged that defendant failed to meet the requirements of MCL 460.593(1)(b) because none of defendant's facilities interconnected with the Projects. Quoting from MCL 460.593(1), plaintiff maintained that Act 125 required incumbent electric transmission companies to " 'construct, own, operate, maintain, and control' a regionally cost-shared transmission line." According to plaintiff, the use of the word "and" meant that the statutory right encompassed all of the aspects of construction and ownership of a transmission line. Thus, it argued that Act 125 did not permit defendant to selectively participate in the construction and ownership process. Plaintiff requested the trial court declare that defendant did not meet Act 125's requirements, thereby preventing it from claiming ownership in the Projects.

Plaintiff thereafter moved for summary disposition under MCR 2.116(C)(10). Relevant to this appeal, it argued that it met the necessary requirements to claim a right of first refusal under Act 125, but that defendant did not, because defendant did not have any facilities that interconnected with the Projects. Plaintiff observed that the Hiple-Duck Lake Project ran from Indiana to plaintiff's new Duck Lake Substation without interconnecting with defendant's facilities, while the Oneida-Nelson Road Project began at the Oneida Substation, which plaintiff wholly owned, and ended at the Nelson Substation, which plaintiff also wholly owned. Therefore, plaintiff stated that defendant could not assert a right of first refusal under Act 125 and lacked any interests in the Projects.

Defendant responded that its Oneida Lines *did* interconnect with the Projects. Regarding the Hiple-Duck Lake Project, defendant contended that eight transmission lines needed to interconnect with the new Duck Lake Substation. According to defendant, two of these lines were from defendant's Oneida Lines, thereby interconnecting those lines with the Hiple-Duck Lake Project. As to the Oneida-Nelson Road Project, defendant contended that the new replacement bus at the Oneida Substation was cost-shared and that defendant "interconnects to the existing bus and will directly connect to the new bus at the Oneida substation," thereby interconnecting the Oneida Lines with the Oneida-Nelson Road Project. Furthermore, defendant argued that "[s]uch interconnection of the Oneida Line to the [transmission projects] is critical to MISO's plans provided in the LRTP," specifically the LRTP's recognition that it would integrate with existing transmission lines where possible. Defendant also relied on dictionary definitions of the word "interconnect" to conclude that a direct, physical connection between defendant's facilities and the Projects was not necessary to establish that they were "interconnected." Regarding the notice of intent, defendant explained that it had merely been trying to "coordinate" and "participate" with plaintiff in "good faith in seeking to exercise responsibly its joint ownership interests alongside [plaintiff]," which Act 125 expressly contemplated by allowing multiple entities to exercise their rights.

Defendant additionally filed a one-count counterclaim seeking declaratory relief. Defendant alleged that its Oneida Lines would interconnect with the Projects, thereby fulfilling

the requirements of MCL 460.593(1)(b). Defendant alleged that, in its notice of intent, it "had made clear its intent to responsibly and jointly exercise its ownership interests with [plaintiff] as provided by Act 125." Defendant requested the trial court declare that defendant "(a) is an 'incumbent electric transmission company' under Act 125; [and] (b) has 'a right to construct, own, operate, maintain, and control' the Projects under Section 3 of Act 125 . . . ."

Plaintiff moved for summary disposition under MCR 2.116(C)(10) as to defendant's counterclaim, raising many of the same arguments as its first motion. Addressing defendant's position that no direct, physical connection was needed to meet the statutory definition of "interconnect," plaintiff characterized defendant's position as being that "this requirement is satisfied so long as [defendant]-owned facilities connect to facilities owned by others that, at some point down the line on an electric grid that spans thousands of miles, eventually connect to the [plaintiff's] Projects." Plaintiff argued that defendant had narrowly looked at the definition of "interconnect" in isolation from the rest of the statute. According to plaintiff, Act 125 required "one specific and tangible asset (the regionally cost-shared transmission line) to 'interconnect to' another specific and tangible asset ([defendant]'s facilities)," which necessarily required "a specific, physical point of interconnection where [defendant]'s facilities will 'interconnect to' the [plaintiff's] Projects"; this physical point was something that defendant failed to establish. Plaintiff maintained that defendant's interpretation would render the interconnection language meaningless because it would allow facilities across the country to interconnect with one another despite being "separated by hundreds of miles, numerous state lines, and numerous discrete interconnection points[.]"

Plaintiff pointed to defendant's own map [i.e., Map 2 above] as evidence that the Oneida Lines indisputably would not directly touch, i.e., interconnect, with the Hiple-Duck Lake Project. Regarding the Oneida-Nelson Road Project, plaintiff argued that the fact that the Oneida Lines ran between the Projects was irrelevant to whether those lines interconnected with the Projects. Plaintiff reiterated that the Oneida Lines' end point was at the line entrance structure on the south side of the substation, both of which were wholly owned by plaintiff. Plaintiff also disputed defendant's contention that the Oneida Lines connected to any existing bus at the substation.

The trial court granted summary disposition in plaintiff's favor and denied any relief to defendant. At a hearing on the matter, the court stated:

> So, what the statute is saying in my view is that the line approved in the plan or something to be constructed that's approved in the plan is what must interconnect. In other words, it's the fixed plan [i.e., the LRTP] that this Court must look to in determining interconnection. There is nothing in the approved plan that provides for a future connection between Hiple Duck Lake and Oneida Nelson. Will they ultimately have to connect? Well, common sense would say yes. But the connection is not approved in the plan. It is not part of the plan.

The court then rejected defendant's argument concerning the bus:

> Now, whether that's part of the plan or a voluntary upgrade undertaken by the plaintiff is really of no consequence because the fact remains that there's no transmission line to be constructed in the approved plan that would indicate how

and where the two lines would be connected. Not only does the statute in subsection A and B require interconnection to be dependent on what is approved in the plan, but the statutory timeframes do as well. So, if interconnection depended on something to be constructed in the future, then an incumbent electric transmission company could never exercise its right of first refusal or comply with the other requirements within the time frames of the statute. Because you would have yet to know whether you qualify by interconnecting with something that isn't in the plan and has yet to be built.

Even assuming that it needed to address direct versus indirect connection, the trial court determined that a direct connection would be needed. The court reasoned that the Legislature could have specifically defined the word "interconnected," but elected not to do so. Reading the statute as a whole, the court ultimately agreed with plaintiff's definition, finding that defendant's interpretation would lead to absurd results. According to the court, an indirect connection would mean "that a whole line of facility owners potentially reaching across the country could potentially satisfy Act 125's requirements." The court further reasoned that the transmission owners "would all have the right to own, operate, control and all the words of the statute, the . . . project and the approved plan. And that surely cannot be."

The trial court also determined that defendant's notice of intent was defective. It rejected defendant's contention that it could selectively exercise the rights listed in the statute. In a subsequent final order, the trial court granted plaintiff's motion for summary disposition as to Count I of its complaint and "declare[d] that [defendant] may not claim ownership in or otherwise participate in or interfere with the ownership, operation, construction, maintenance, or control of the transmission projects at issue in this case, and permanently enjoin[ed] [defendant] from doing so." The court also granted plaintiff's motion for summary disposition as to defendant's counterclaim and dismissed the counterclaim with prejudice. This appeal followed.

## II. ANALYSIS

Defendant argues that summary disposition was improper because the trial court erroneously determined that no evidence existed to show that defendant's facilities would "interconnect" with the Projects within the meaning of Act 125. We disagree.

We review de novo a trial court's decision on summary disposition. *Tripp v Baker*, 346 Mich App 257, 272; 12 NW3d 45 (2023). The trial court granted summary disposition to plaintiff under MCR 2.116(C)(10). A motion is properly granted under MCR 2.116(C)(10) "when the proffered evidence fails to establish a genuine question of fact." *Tripp*, 346 Mich App at 262. We "must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Dextrom v Wexford Co*, 287 Mich App 406, 415-416; 789 NW2d 211 (2010).

We likewise review de novo questions of statutory interpretation. *McQueer v Perfect Fence Co*, 502 Mich 276, 285-286; 917 NW2d 584 (2018). "All matters of statutory interpretation begin with an examination of the language of the statute." *Id*. at 286. If a statute is unambiguous, it "must be applied as written." *Id*. (quotation marks and citation omitted). This Court may not

read something into the statute "that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Id*. (quotation marks and citation omitted). Furthermore, statutory language "cannot be viewed in isolation, but must be construed in accordance with the surrounding text and the statutory scheme." *Id*. (quotation marks and citation omitted). "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). Finally, courts "give undefined statutory terms their plain and ordinary meanings." *Id*.

MCL 460.593(1) provides that an "incumbent electric transmission company" may "construct, own, operate, maintain, and control a regionally cost-shared transmission line" if the following criteria apply:

> (a) The regionally cost-shared transmission line or its construction was included in a plan adopted or otherwise approved by a recognized electric planning authority for the incumbent electric transmission company.

> (b) The regionally cost-shared transmission line will interconnect to facilities owned, or that will be owned, by that incumbent electric transmission company.

Additionally, MCL 460.593(2) contemplates more than a single incumbent electric transmission company having ownership rights in transmission lines:

> (2) The right to construct, own, operate, maintain, and control a regionally cost-shared transmission line that will interconnect to facilities owned by 2 or more incumbent electric transmission companies belongs individually and equally to each incumbent electric transmission company, unless otherwise agreed to in writing by each incumbent electric transmission company.

These parties dispute the meaning of the word "interconnect" in the statute. Specifically, they dispute whether defendant's Oneida Lines *interconnect* with the Hiple-Duck Lake Project and the Oneida-Nelson Road Project. The word "interconnect" is not statutorily defined, which means this Court may consult a dictionary to determine the word's "common and ordinary meaning." *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011). As a transitive verb, "interconnect" is defined as "to connect with one another[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed). As an intransitive verb, it is defined as "to be or become mutually connected[.]" *Id*. The word "connect" can in turn be defined as "to become joined" or "to join or fasten together usually by something intervening[.]" *Id*.

Defining "interconnect" with its root word, "connect," appears to comport with surrounding statutory provisions. MCL 460.593(3)(a), which addresses the notice of intent requirements, uses the following language: "an incumbent electric transmission company . . . that owns a *connecting electric transmission facility* . . . ." (Emphasis added.) This use of the word "connecting" strongly suggests that defining "interconnect" is meant to include "connect." The more common and ordinary meaning of the word "connect" is to "become joined[.]" Taking this definition into account, we conclude that defendant's Oneida Lines must physically "join" with

the Projects. We are thus persuaded that the trial court was correct in determining that a direct, physical connection is necessary to show that the facilities are "interconnected" under Act 125.

We also agree with the trial court that defendant's interpretation could lead to absurd results. Defendant's interpretation seemingly renders the word "interconnect" meaningless by allowing a company to meet the requirement simply by being connected to a different company's transmission lines, which in turn directly connect to a regionally cost-shared transmission line. Were defendant to succeed here, incumbent electrical transmission companies much further down a line could assert ownership rights in transmission lines with potentially enormous degrees of separation. Here, there is only *one* degree of separation at issue. Nonetheless, defendant's interpretation leaves open the question of how many degrees of separation would lead to an absurd result. We fail to see how this comports with the clear legislative intent of Act 125, and decline to entertain the theory further. See *Barrow v Detroit Election Comm*, 301 Mich App 404, 416; 836 NW2d 498 (2013) (citation omitted) ("Under the absurd-results rule, 'a statute should be construed to avoid absurd results that are manifestly inconsistent with legislative intent . . . .' "). Instead, we conclude that, given the Legislature's use of the phrase "interconnect to facilities owned . . . by that incumbent electric transmission company," an incumbent's facilities must directly connect to a regionally cost-shared transmission line.

We turn now to the merits of defendant's contention that summary disposition was improperly granted in this matter. The LRTP provides that the Hiple-Duck Lake Project involved the installation of a "double circuit 345kV transmission line from the existing Hiple to the new Duck Lake Substation." The second of defendant's maps, shown in Section I(A), demonstrated that the Oneida Lines would not directly or indirectly connect with this project. The red lines, which represent the new transmission lines, connect to the new Duck Lake Substation. This substation in turn will connect to the orange lines, which are wholly owned by plaintiff. Marshall affirmed as much in his affidavit, and defendant never rebutted that point. In fact, Taylor acknowledged in his second affidavit that the Oneida Lines ran southward from the Oneida Substation before connecting to the Battle Creek and Majestic lines near to the new Duck Lake Substation. There is no evidence in the record showing that the new substation will cross over plaintiff's lines or otherwise connect with the blue lines, which are the only lines in which defendant has an ownership interest.

The language that defendant points to in the LRTP offers little support. The LRTP provides that the Hiple-Duck Lake Project additionally involved the construction of a "new 8-position 345kV breaker-and-a-half bus substation[,]" and would "[l]oop in Argenta-Tompkins, Battle Creek-Oneida, and Oneida-Majestic 345 kV lines into Duck Lake." Defendant points to Taylor's affidavit, in which he affirmed that this language meant that "eight lines should interconnect at the new Duck Lake Substation." According to Taylor's understanding, these eight lines included (1) two lines from Hiple to the new Duck Lake Substation; (2) one line from the Argenta Substation to the new Duck Lake Substation; (3) one line from the Battle Creek Substation to the new Duck Lake Substation; (4) one line from the Tompkins Substation to the new Duck Lake Substation; (5) one line from the Majestic Substation to the new Duck Lake Substation; and (6) two lines from the Oneida Substation to the new Duck Lake Substation.

In other words, two lines loop in from the south (the red lines), a total of four lines loop in from the east and west (the orange lines), and two lines loop in from the north (the blue lines). But

the language about a "new 8-position 345kV breaker-and-a-half bus substation" says nothing about any requirement to connect in any lines, let alone a total of eight lines. Rather, it merely mandates that this 8-position bus substation be constructed, without further explanation. The LRTP expressly mentions looping in the Argenta-Tompkins, Battle Creek-Oneida, and Oneida-Majestic lines, without any mention of the northern Oneida Lines. Map 2 supports this, and clearly shows that defendant's Oneida Lines interconnect with plaintiff's orange lines, not with the new Duck Lake Substation. Therefore, Taylor's understanding of the matter appears to run contrary to the language of the LRTP.

In his affidavit, Marshall explained that MISO had not dictated how any of the Projects were to interconnect to existing facilities. He explained that this was normal because flexibility was required for points of interconnection and were typically left to the transmission owner's discretion. He affirmed that plaintiff had decided to interconnect the Hiple-Duck Lake Project into plaintiff's wholly owned and preexisting transmission lines, i.e., the orange lines depicted on the prior map running east to west. Marshall also affirmed that the Oneida Lines would not intersect or connect to the new Duck Lake Substation or its new transmission line and that to do so would require plaintiff to crossover its existing transmission lines.

We ultimately agree with the trial court that nothing in the LRTP "provides for a future connection between Hiple Duck Lake and Oneida Nelson." The LRTP provided that a new transmission line was to be constructed between Hiple Substation and the new Duck Lake Substation; it said nothing about the Oneida Lines. Moreover, the LRTP's language about the "8-position bus" says nothing about mandating eight connections, and the looping in of the other three sets of lines were conceded to be lines wholly owned by plaintiff. The Oneida Line was not mentioned. While electricity may ultimately flow between the Oneida Lines and the Hiple-Duck Lake Project, defendant has not demonstrated that they interconnect.

As for the Oneida-Nelson Road Project, the LRTP provided that this project involved the installation of a "double circuit 345kV transmission line from the existing Oneida Substation, to the existing Nelson Road Substation." Marshall affirmed that the Oneida Substation was wholly owned by plaintiff, that the project's transmission line would connect to the Oneida Substation from the north, and that defendant's Oneida Line connected to the substation from the south. Accordingly, the Oneida-Nelson Road Project did not connect to the Oneida Line or any of defendant's facilities. In other words, defendant's Oneida Lines and project lines were on opposite ends of the substation. Taylor did not refute this, and defendant provided no other evidence in rebuttal.

However, the LRTP mandated that the Oneida-Nelson Road Project involved the addition of "2-345kV line positions" to "replace [an] existing bus with breaker-and-a-half bus[]." The LRTP clearly sets forth that a bus must be replaced at the Oneida Substation (wholly owned by plaintiff), and this replacement must be cost-shared. However, the LRTP says nothing about connecting defendant's Oneida Lines to this bus or to the new transmission line. Instead, Marshall's unrebutted affirmations demonstrated that the new transmission line from the LRTP would connect to the substation from the north while the Oneida Lines connected to the substation from the south. The trial court appeared to recognize this when it stated that "whether that's part of the plan or a voluntary upgrade undertaken by the plaintiff is really of no consequence because

-13-

the fact remains that there's no transmission line to be constructed in the approved plan that would indicate how and where the two lines would be connected."

Evaluating the evidence in the light most favorable to defendant, Taylor's affidavit fails to show that the Oneida Lines must connect to the replacement bus specified in the LRTP. Moreover, Taylor merely affirmed that, because electricity from the Oneida Lines must reach the substation by flowing into a bus, the line entrance structure was immaterial. However, defendant's "power flow" argument fails for those reasons already discussed: a direct, physical connection is needed to establish "interconnection" under Act 125. Simply because power flows between two lines does not mean they interconnect. To allow interconnection from power flow would negate the interconnection requirement and once again lead to absurd results. Ultimately, there is no genuine issue of material fact that defendant's Oneida Lines did not interconnect with the Projects. Both the LRTP and the physical geography demonstrated that the Oneida Lines did not touch the Projects. Instead, the Oneida Lines were separated by plaintiff's facilities, which were the only direct connection to the Projects. Accordingly, the trial court did not err by granting summary disposition in favor of plaintiff.[6]

Affirmed.

/s/ Michelle M. Rick
/s/ Kristina Robinson Garrett
/s/ Kathleen A. Feeney

---

[6] Because our ruling on this matter is dispositive, we decline to address whether the trial court erred by ruling that defendant's notice of intent was defective.